PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1165
_____

PPG INDUSTRIES INC.,
Appellant

v.

UNITED STATES OF AMERICA; UNITED STATES
DEPARTMENT OF COMMERCE;
SECRETARY UNITED STATES DEPARTMENT OF
COMMERCE;
UNITED STATES DEPARTMENT OF DEFENSE
_____

On Appeal from the United States District Court
for the District of New Jersey
(D. C. No. 2-12-cv-03526)
District Judge:  Honorable John M. Vazquez
_____

Argued December 9, 2019
Before:  RESTREPO, ROTH and FISHER, *Circuit Judges*.

(Filed: May 4, 2020)

Adam G. Husik
Joseph F. Lagrotteria  *[ARGUED]*
K&L Gates
One Newark Center, 10th Floor
Newark, NJ 07102

Joseph M. Rainsbury, I
Miles & Stockbridge
919 East Main Street
Suite 1100
Richmond, VA 23219
    *Counsel for Appellant*

Jeffrey Bossert Clark, Assistant Attorney General
Allen M. Brabender  *[ARGUED]*
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7415
Washington, DC 20044
    *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

This case raises the question of whether the Government's involvement at a chromite ore processing plant during World War I and World War II made it an "operator" under § 107(a)(2) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, and thus liable to PPG Industries, Inc. for the cleanup costs associated with the waste. The District Court concluded that the Government was not subject to operator liability because its actions in relation to the plant were consistent with general wartime influence over an industry and did not extend to control over the plant's pollution-related activities. Accordingly, the District Court denied PPG's motion for summary judgment and granted the Government's. We will affirm.

## I. Background

Because the key question in this case is whether the Government exercised the requisite control over pollution-related operations at PPG's property at the time hazardous substances were released, we review in detail the facts regarding the Government's historic management and direction of the relevant industry (chromium chemicals).

### A. Chromium Chemicals Production and Waste Disposal at the Site

Beginning around 1915, Natural Products Refining Corporation ("NPRC") operated a chemical plant in Jersey City, New Jersey, at which it turned chromite ore into chromium chemicals (primarily sodium bichromate) used for dyeing cloth and tanning leather. The manufacturing process generated hazardous chemical waste in various forms, including large amounts of "mud" or "sludge." Most of the waste was stockpiled outdoors, "uncovered and exposed to the

3

elements." J.A. 225. Consequently, hazardous substances eventually seeped into the soil and groundwater.

B. Government Regulation of Chromium Chemicals During WWI and WWII

During both World Wars, the Government regulated the production of chromium chemicals like the ones NPRC manufactured in Jersey City. Much of the historical record surrounding the Government's involvement with chromium processing at the site during WWI has been lost to time. Therefore, the bulk of the record concerns the Government's actions during WWII.[1] At that time, the chromium chemicals industry in the United States consisted of five producers, including NPRC, and six plants, including the site at issue here. During World War II, the Government designated chromium chemicals as "critical" war materials—products manufactured for direct military use—and implemented several controls.

1. Price Controls

The Government issued various orders designed to conserve chromium and direct its distribution. For example, the War Production Board controlled the price of raw materials, the quantities of chromite ore that processors such as NPRC could buy, to whom they could sell, how much they could sell, and which of their purchase orders had priority. These orders did not, however, direct how the ores were to be processed, how the chromium chemicals were to be made, or how chromium waste was to be handled.

---

[1] PPG argues "[i]t is highly likely" that during WWI, the Government provided similar direction to what it provided in WWII. Appellant's Br. 48. However, "there are no surviving records." *Id.*

## 2. Labor Controls

Labor shortages in the chromium chemicals industry were particularly severe during WWII because of low wages and poor working conditions. Alarmed that such shortages would affect the war effort, various federal agencies worked to address the problem. These efforts ranged from studying ways to improve working conditions, to authorizing wage increases for workers, to calling in the Army to seize plants where workers were on strike. There is, however, no evidence that the Government ever seized NPRC's plant.

In addition, at various points the Government suggested making changes to the workweek schedule at production facilities. For example, although NPRC initially operated on a six-day workweek to avoid paying overtime rates, in early 1944, a representative from the Army Service Forces suggested that "an effort be made to provide 7-day operation." JA663. From then on, NPRC operated the site seven days a week.

## 3. Production Controls and Subsidies

By early 1944, the United States faced a growing shortage of chromium chemicals. Concerned about the impact of the shortage on the war effort, the Chemicals Bureau of the War Production Board convened a committee that included various government entities and industry representatives, including NPRC's president. The committee considered three proposals to bolster production: (1) run the same ore fewer times through the manufacturing process, which would result in a higher output of sodium bichromate since each successive run of the same ore yields less material for producing sodium bichromate; (2) use higher-grade, but more expensive, Russian ore; and (3) expand plant capacity.

Before the war, NPRC had applied for a patent to protect the process proposed in the first option. Running the

same ore through the manufacturing process fewer times was quicker than the traditional process, but also more wasteful, because it left chromium in the waste sludge that would have otherwise been extracted in the additional runs. NPRC reported that it probably could increase production "by wasteful use of chromite ore . . . but the ore losses w[ould] have to be subsidized." J.A. 492. To address this concern, the Government Metals Reserve considered buying the waste sludge at a price high enough to compensate manufacturers for their uneconomic use of ore. On April 6, 1944, the Chemicals Bureau officially recommended that producers—including NPRC—switch to the quicker, more wasteful process. A few days later, however, the Metals Reserve formally rejected the sludge purchasing plan as falling outside its "sphere of activities." J.A. 513. NPRC implemented the process anyway, but there is no evidence that Metals Reserve, or any other federal entity, ever purchased waste sludge from NPRC.

NPRC rejected the second option, using more expensive Russian ore with a higher chromium content. Although the Government subsidized the purchase of Russian ore, NPRC stated: "We have no high grade ore on hand at the present time, nor do we anticipate the purchase of any unless we are compelled to do so on account of a shortage of low grade ore." J.A. 522. While there is evidence that other chromium chemical manufacturers took this subsidy, there is no evidence that NPRC ever did.

The chromium chemicals manufacturers opposed the third option—expanding plant capacity—because they did not want new competition. Instead, the companies, including NPRC, attempted to expand production at existing plants. NPRC applied for a project to expand production, which the War Production Board approved and secured funding for. A

few months later, however, NPRC decided against the expansion.

### C. PPG's Purchase and Cleanup of the Site

PPG purchased the site from NPRC in 1954 and processed chromium chemicals there until 1963. PPG used essentially the same processes as NPRC had, including stockpiling the waste outdoors. Since 1990, PPG has spent $367 million (by its own estimate) to remediate the site, as well as other areas contaminated by the waste produced there.[2]

In 2012, PPG sued the Government under § 107(a) of CERCLA, seeking recovery and contribution for costs associated with past and future cleanup efforts. In 2018, after over four years of discovery, PPG and the Government brought cross-motions for summary judgment. The District Court granted the Government's motion, reasoning that the Government was not liable to PPG as an operator under § 107(a) of CERCLA. PPG appeals.

### II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction to review the District Court's final order under 28 U.S.C. § 1291. We exercise plenary review over a district court's grant or denial of a motion for summary judgment. *Pa. Dep't of Envtl. Prot. v. Trainer Custom Chem.,*

---

[2] For example, chromium waste was taken to other locations in the county for purposes such as "the backfilling of demolition sites, preparation for building foundations, construction of tank berms, roadway construction, [and] the filling of wetlands." J.A. 105–06 (quoting Administrative Consent Order between PPG and the New Jersey Department of Environmental Protection).

*LLC*, 906 F.3d 85, 91 n.7 (3d Cir. 2018). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). We apply the same standard as the District Court and must draw all justifiable inferences in the non-moving party's favor. *Id.*

## III. Analysis

PPG argues that the District Court erred in two ways: first, in applying the wrong legal standard for past operator liability under § 107(a)(2) of CERCLA, and, second, in concluding that the Government was not a past operator of the site. We first clarify the legal standard that should be applied and then determine whether the Government is subject to operator liability under that standard.

### A. Past Operator Liability Under § 107(a)(2) of CERLCA

In 1980, Congress enacted CERCLA "in response to the serious environmental and health risks posed by industrial pollution." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998). CERCLA aims "to promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (quoting *Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005)). Accordingly, § 113(f) of CERCLA authorizes government agencies or private parties who undertake cleanup efforts at contaminated sites to "seek contribution from any other person who is liable or potentially liable" for the contamination. 42 U.S.C. § 9613(f)(1). Section 107(a) defines four classes of "potentially responsible parties" who may be held strictly

8

liable for releases of hazardous substances that occurred at a facility: (1) current owners and operators of the facility; (2) persons who owned or operated the facility "at the time of disposal of any hazardous substance"; (3) persons who arranged for the disposal or treatment of the hazardous substance; and (4) persons who transported the hazardous substance. *Id.* § 9607(a); *see also Burlington*, 556 U.S. at 608–09.

The sole issue here is whether the Government is a past operator under the second category, that is, a "person who at the time of disposal of any hazardous substance owned or *operated* any facility at which such hazardous substances were disposed of."[3] 42 U.S.C. § 9607(a)(2) (emphasis added). Both parties agree that the Government is a "person," as defined in § 101(21), and that the site is a "facility," under § 101(9). *See id.* § 9601(9), (21). The parties disagree, however, about the meaning of the word "operator" in § 107(a)(2). Given that the statute defines that word only by tautology ("any person owning or operating such facility," *id.* § 9601(20)(A)(ii)), we now turn to a discussion of that term.

This is not the first time that we have considered the meaning of the term "operator" in the context of § 107(a)(2) of CERCLA. We must look to prior decisions of our Court, as well as the Supreme Court, to guide our analysis of this issue.

First, in *FMC Corp. v. United States Department of Commerce*, 29 F.3d 833 (3d Cir. 1994) (en banc), we considered a CERCLA claim by the owner of a rayon manufacturing plant for contribution from the United States for

---

[3] PPG does not allege that the United States owned the site, or that any Government employees ever worked or were stationed there.

9

the cleanup of an industrial facility. The manufacturer claimed that the United States was liable as a past operator because it "became involved so pervasively in the facility [during WWII] that it effectively operated the plant along with [the owner at the time]." *Id.* at 835. We applied the "actual control" test, under which an entity is "liable for the environmental violations of another [entity] if there is evidence that it exercised 'substantial control' over the other [entity]. At a minimum, substantial control requires 'active involvement in the activities' of the other [entity]." *Id.* at 843 (quoting *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1222 (3d Cir. 1993)).[4]

We held that the government had "substantial control" over the facility, had "active involvement in the activities there," and "exerted considerable day-to-day control over [the owner of the facility]." *Id.* at 843–44 (internal quotation marks omitted). Specifically,

> The government determined what product the facility would manufacture, controlled the supply and price of the facility's raw materials, in part by building or causing plants to be built near the facility for their production, supplied equipment for use in the

---

[4] We first adopted the "actual control" test in *Lansford-Coaldale*, 4 F.3d at 1209. Although we acknowledged that *Lansford-Coaldale* "arose in the context of related corporations," we determined that its "active control" test was "nevertheless instructive" in determining whether the government was a past operator. *FMC*, 29 F.3d at 843.

> manufacturing process, acted to ensure that the facility retained an adequate labor force, participated in the management and supervision of the labor force, had the authority to remove workers who were incompetent or guilty of misconduct, controlled the price of the facility's product, and controlled who could purchase the product.

*Id.* at 843. Furthermore, the government knew that "generation of hazardous waste inhered in the production process because its personnel present at the facility witnessed a large amount of highly visible waste disposal activity," and "wastes were generated and disposed of by the government-owned equipment that was installed at the facility." *Id.* at 837–38. Thus, we concluded, "[g]iven this degree of control, and given the fact that the wastes would not have been created if not for the government's activities, the government [was] liable as an operator." *Id.* at 844.

Four years later, the Supreme Court addressed the definitional question. In *Bestfoods*, the United States argued that a parent corporation was a past operator for purposes of CERCLA and therefore liable for the costs of cleaning up industrial waste generated by its subsidiary's chemical plant. 524 U.S. at 55. *Bestfoods* held that to determine whether to impose direct CERCLA operator liability on a parent corporation based on pollution from its subsidiary's facility, the question is not whether the parent operates the *subsidiary*, but whether the parent operates the *facility*. *Id.* at 66–68. That much was clear: "Under the plain language of the statute, any

11

person who operates *a polluting facility* is directly liable for the costs of cleaning up the pollution." *Id.* at 65 (emphasis added).

The more difficult question was determining "the actions sufficient to constitute direct parental 'operation.'" *Id.* at 66. After noting the "uselessness" of CERCLA's definition of an operator, the Court sought to define the term by giving it "its 'ordinary or natural meaning.'" *Id.* at 66 (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995)). It stated that "in the organizational sense . . . intended by CERCLA, the word ordinarily means '[t]o conduct the affairs of; manage: *operate a business*'"—or, more specifically to CERCLA, a site or facility. *Id.* (quoting American Heritage Dictionary 1268 (3d ed. 1992)). Therefore, the Court continued, "[t]o sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66–67.

Thus, *Bestfoods* emphasized that the determination of whether an entity is an operator for purposes of CERCLA liability must be based on the relationship between the potentially responsible party and the waste-producing facility at issue. In doing so, *Bestfoods* rejected the lower court's application of the "actual control" test, which focused on the relationship between the potentially responsible party and the owner of the facility, rather than on the relationship between the potentially responsible party and the facility. *Id.* at 67–68. The Court reasoned that the actual control test improperly combined "direct and indirect liability . . . by asking a question about the relationship between the two corporations (an issue going to indirect liability) instead of a question about the parent's interaction with the subsidiary's *facility* (the source of

12

any *direct liability*).” *Id.* at 67 (emphasis added). The Court ultimately remanded for the district court to assess, in the first instance, the parent corporation's involvement in the activities of the subsidiary's facility.[5] *Id.* at 72–73.

We subsequently applied the *Bestfoods* standard in a case involving current operator liability under § 107(a)(1) of CERCLA. *Litgo N.J., Inc. v. Comm'r N.J. Dep't of Envtl. Prot.*, 725 F.3d 369 (3d Cir. 2013). There, a purchaser of a contaminated site argued that it should not be held liable as a current operator because it did not engage in any operations that caused further contamination, and therefore was not involved in “operations specifically related to pollution.” *Id.* at 381 (quoting *Bestfoods*, 524 U.S. at 66). We, however, rejected that reading of *Bestfoods* as too narrow, explaining that:

> In defining “operator,” the Supreme Court employed broad, passive language: an operator is one who is involved in operations “*having to do with* the leakage or disposal of hazardous waste,” not one who is involved in operations “causing” or “leading to” the

---

[5] Under the specific facts of *Bestfoods*, there was evidence that an agent of the parent corporation “played a conspicuous part in dealing with the toxic risks emanating from the operation of the plant.” 524 U.S. at 72. Because of the work of this agent, the parent corporation “became directly involved in environmental and regulatory matters.” *Id.* Thus, the Supreme Court found that the parent corporation's “operation” of the facility was an issue and remanded the case for further proceedings. *Id.*

13

> leakage or disposal of waste. Moreover, the Court expressly noted that operator liability may be imposed when a party is responsible for "decisions about compliance with environmental regulations," a description which directly applies to the [purchaser's] activities at the Property.

*Id.* at 382 (internal citations omitted). We concluded that the purchaser was actively involved in activities related to the contamination on the property: not only did it have the actual authority "to make decisions about compliance with environmental regulations, [it] hired environmental consultants to conduct tests and remediation operations . . . and . . . oversaw that work." *Id.* at 381.

In sum, consistent with *FMC*, the *Bestfoods* standard (1) focuses on the relationship between the purported operator and the facility at issue; and (2) further focuses on "operations specifically related to pollution." 524 U.S. at 66. Subsequently, in *Litgo*, we maintained an appropriate focus on pollution-related activities at the facility. Also in *Litgo*, we applied the *Bestfoods* operator definition outside the parent-subsidiary context.

Here, PPG argues that because *Bestfoods* did not address whether and under what circumstances the *government* can be held liable as an operator, we should follow the standard outlined in *FMC*, where we held that the government was liable as an operator because it "had 'substantial control' over the facility and 'active involvement in the activities' there." Appellant's Br. 44–45 (quoting *FMC*, 29 F.3d at 843). Indeed,

14

PPG alleges that "as in *FMC*, the Government [here] was an operator of the [site] during WWII." Appellant's Br. 48. We disagree.

While PPG is correct that *Bestfoods* did not address when the government can be held liable as an operator, this distinction is irrelevant. At no point, regardless of how the test was formulated, has any court said that the test for determining operator liability should be different depending on whether the potentially responsible party is the government, a parent or subsidiary, or some other type of corporation. *See FMC*, 29 F.3d at 843 (taking a test we originally applied to corporate parties and applying it to the government)[6]; *Litgo*, 725 F.3d at 382 (applying the *Bestfoods* operator definition to a potentially-liable party outside of the parent-subsidiary context). Thus, the *Bestfoods* operator definition is not limited to the parent-subsidiary context and applies when the question is whether the government can be held liable as an operator.[7]

---

[6] We explained that while the *Lansford-Coaldale* "actual control" test "arose in the context of related corporations, it is nevertheless instructive here." *FMC*, 29 F.3d at 843.

[7] *Bestfoods* discusses the parent-subsidiary relationship at length in order to emphasize that traditional parent responsibility or indirect liability for subsidiary acts is immaterial in the CERCLA context. The Court makes clear that "the plain language" of CERCLA imposes *direct* liability on an operator—"regardless of whether that person is the facility's owner, the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice . . . [T]he existence of the parent-subsidiary relationship under state corporate law is

15

Alternatively, PPG argues that to the extent that we conclude that *Bestfoods* is applicable, the *Bestfoods* definition of operator does not mean that "operators" "are limited to employees directly working with, or making low-level decisions about, hazardous waste." Appellant's Br. 42. Rather, PPG emphasizes, "[t]he statute obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the direction over the facility's activities." Appellant's Br. 42 (quoting *Bestfoods*, 524 U.S. at 71). Thus, PPG argues that the term "operator" "encompasses persons having general control over a facility." Appellant's Br. 42.

We disagree. *Bestfoods* clarified that operator liability only extends to those who "manage, direct, or conduct operations *specifically related to pollution*, that is, operations having to do with the leakage or disposal of hazardous waste or decisions about compliance with environmental regulations." 524 U.S. at 66–67 (emphasis added). This means that operator liability requires something more than general control over an industry or facility—it requires some indicia of control over the facility's polluting activities. Thus, the language the Supreme Court used in *Bestfoods* suggests that operator liability requires something more than general wartime control over an industry.

Rather, *Bestfoods* instructs that an operator must exercise control over "operations having to do with the leakage or disposal of hazardous waste or decisions about compliance

simply irrelevant to the issue of direct liability." 524 U.S. at 65. The same holds true, perhaps even more strongly, in a case like this, where there is no tangled parent-subsidiary relationship.

16

with environmental regulations." 524 U.S. at 66–67. Under *Bestfoods*, then, to prevail on its claim that the Government operated the site, PPG must show that the Government exercised control over such operations.

We will now apply the *Bestfoods* standard for operator liability.

## B. The Government Is Not Subject to Operator Liability Under CERCLA

Applying the *Bestfoods* definition of operator, we conclude that the District Court did not err in concluding that the Government never directly managed, directed, or conducted NPRC's operations specifically related to pollution.

## 1. The Government Did Not Control Operations Related to Pollution

We agree with PPG that the Government was involved in various aspects of production at NPRC's plant during WWII. For example, the Government controlled the price of raw materials, the quantities of chromite ore that processors such as NPRC could buy, to whom they could sell, how much they could sell, and which of their purchase orders had priority. Furthermore, the Government worked to ameliorate severe labor shortages in the chromium chemicals industry by studying ways to improve working conditions, authorizing wage increases for workers, and calling in the Army in response to a labor strike—though there is no evidence that the Government ever seized NPRC's plant.

However, PPG has presented no evidence that the Government specifically controlled operations related to pollution. PPG has not offered any evidence to suggest that the Government was involved with or responsible for the practice of stockpiling the waste outdoors, which is what led to the

17

contamination. In fact, the evidence shows that this was NPRC's practice both before and after the World Wars.[8]

PPG contends that, under the *Bestfoods* standard, there was a "nexus" between the Government's activities and "waste-disposal matters" at the site because "[t]he overall process . . . [,] with which the Government was familiar[,] was inherently hazardous-waste-producing." Appellant Br. 52. The Government understood, PPG argues, that "[c]hrome-laden mud was an inevitable byproduct. Groundwater contamination, in turn, was an inevitable consequence of stockpiling the mud outside at the Site. Thus, the Government's pressuring [NPRC] to ramp up production was . . . a Government directive to produce more . . . waste." Appellant's Br. 52.

This argument fails. To the extent that PPG alleges that the Government is liable because it was merely aware of NPRC's practice of stockpiling the waste outdoors, PPG misstates the law: knowledge of a practice is not the same as undertaking that practice for the purposes of operator liability under CERCLA. For liability to attach, "an operator must manage, direct, or conduct operations specifically related to pollution." *Bestfoods*, 524 U.S. 66. "[M]ere knowledge of waste disposal activities, hazardous or otherwise, although a prerequisite to 'operator' liability, does not, without more, suffice to establish CERCLA 'operator' liability." *Lentz v. Mason*, 961 F. Supp. 709, 716 (D.N.J. 1997).

PPG further argues that there was a "nexus" between the Government's actions and waste disposal at the site

---

[8] "During the period the chromate production facility operated," between about 1909 and 1963, "the majority [of chromium waste] was stockpiled on the southeastern corner of Site 114 and on the adjacent Site 137." J.A. 230–31.

because the Government "directed" NPRC to switch to the quicker, more wasteful manufacturing process. Appellant's Br. 52. It reasons that, given the critical importance of chromium for the war effort and the fact that the Government could have seized the plant, the Government did more than just recommend that NPRC make the switch. But there is no evidence that the Government seized or threatened to seize the NPRC plant. And the mere existence of seizure authority does not support operator liability. *See Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 524 (S.D. Tex. 2015). In addition, PPG has offered no evidence permitting an inference that the Government "demanded," as opposed to "recommended," that NPRC switch to the quicker, more wasteful manufacturing process. J.A. 585–86 ("The Chemicals Bureau Requirements Committee . . . recommends that . . . [a]rrangements be made to increase production of sodium bichromate . . . by . . . purchasing waste sludge from production operations to eliminate reworking of ore . . . .").

Finally, PPG argues that there was a "nexus" between the Government's activities and waste disposal at the site because the Government provided NPRC with a sludge subsidy. This argument rests on a shaky factual foundation. As recounted above, NPRC told the Government that it could increase production "by wasteful use of chromite ore . . . but the ore losses w[ould] have to be subsidized," J.A. 492; the Metals Reserve considered subsidizing waste sludge to address this concern; and the Chemicals Bureau officially recommended that NPRC switch to the quicker, more wasteful process. A few days later, however, the Metals Reserve formally rejected the sludge purchase plan as falling outside its "sphere of activities," J.A. 123–24, and there is no evidence that any federal entity ever purchased waste sludge from NPRC.

PPG argues that there must have been a subsidy—otherwise, when NPRC switched to the quicker process in 1944, it would have incurred losses, rather than what actually happened, which is that it did better financially. PPG also points to a 1949 Government memorandum directing the destruction of Defense Supplies Corporation records related to numerous topics, including "Sodium Bichromate Subsidy." These circumstantial arguments are insufficient to create a genuine factual dispute in the face of evidence showing that the sludge purchase plan was rejected.

In addition, while there is evidence that other chromium chemical manufacturers participated in the Russian ore subsidy, PPG presents no evidence that NPRC ever did. Rather, NPRC stated that "[w]e have no high grade ore on hand at the present time, nor do we anticipate the purchase of any unless we are compelled to do so on account of a shortage of lower grade ore." J.A. 189.

Ultimately, PPG's argument boils down to the following: when faced with a Government directive to increase output during a time of war, NPRC rose to the occasion, and more production meant more waste, which makes the Government liable as an operator. However, a closer examination of the facts shows that NPRC did not have to switch to the quicker, more wasteful process; it could have chosen the Russian ore option to increase output, as other chromium chemicals manufacturers did. Furthermore, the dispositive question is: did the Government "manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste or decisions about compliance with environmental regulations"? *Bestfoods*, 524 U.S. at 66–67. The record clearly answers this question: the Government urged NPRC and all chromium chemicals manufacturers to increase

20

output, but it was NPRC that managed operations specifically related to pollution. It was entirely NPRC's decision, not the Government's, to continue the longstanding practice of stockpiling the majority of the waste outside and uncovered, letting it seep into the soil and groundwater.[9]

Therefore, the District Court did not err when it found that the Government never specifically managed or conducted NPRC's operations related to pollution. The District Court correctly found that the Government's actions in relation to NPRC's plant were consistent with general wartime influence over an industry—not control over NPRC's pollution-related activities. In sum, the Government was not an "operator" under § 107(a)(2) of CERCLA.

## 2. *FMC* is Distinguishable

PPG emphasizes the factual similarities between this case and *FMC*. However, the cases are not as similar as PPG suggests. The government in *FMC* was involved not only in operations at the facility in a general sense, it was specifically involved with waste production and regulation. Although *FMC* pre-dates *Bestfoods*, even under the *Bestfoods* standard, *FMC* was correctly decided.

We agree with the District Court that there are at least four significant factual differences between *FMC* and the present case that demonstrate that while the government operated the facility in *FMC*, the Government did not do so here. In *FMC*, the government (1) built and retained ownership of new facilities near the plant; (2) had a representative on site; (3) ordered the facility to produce a different product; and (4) supplied employees to install equipment. Indeed, in *FMC*, the government effectively seized total control of the plant's

---

[9] It was PPG's decision, as well, from 1954 to 1963.

21

operations by requiring the manufacturer to convert its plant to produce a different product and stepping in to help it achieve this goal, which included involvement in waste disposal. For example, not only did the government know that "generation of hazardous waste inhered in the production process because its personnel present at the facility witnessed a large amount of highly visible waste disposal activity," but "wastes were generated and disposed of by the government-owned equipment that was installed at the facility." *FMC*, 29 F.3d at 837–38.

This is distinguishable from the situation at the NPRC plant, where NPRC freely produced chromium before and after the World Wars, where there was no government representative on site, and where the Government was much less involved in labor decisions and not involved at all in waste disposal decisions. Lastly, rather than being directed by the Government to employ a specific method for increasing output, NPRC itself chose the option that was the most convenient for it.[10]

In *FMC*, we concluded that the government "exerted considerable day-to-day control" over the company that owned the plant at the time. *Id.* at 845. We closed by holding: "Given this degree of control, and given the fact that the wastes would not have been created if not for the government's activities, the government is liable as an operator." *Id.* at 844. Here, it cannot

--------

[10] The quicker, more wasteful process was more "convenient" and less costly for NPRC because NPRC already owned a patent for the "reworking of ore" process and a conversion to this process could be implemented immediately without the need for additional equipment or the purchase of more expensive ore.

22

be said that the Government exercised the same kind of "day-to-day" control. NPRC claims that it switched to the quicker, more wasteful process at the Government's insistence, but it was the only chromium chemical manufacturer to choose this method; the other manufacturers chose to participate in the Russian ore subsidy when asked to increase output. And perhaps most importantly, the waste would have been created and disposed of in the same manner regardless of the government's activities, just as it was before and after the World Wars.[11]

In sum, the present case is distinguishable from *FMC*.

## IV. Conclusion

For these reasons, we will affirm the denial of PPG's motion for summary judgment and grant of the Government's motion for summary judgment.

---

[11] PPG may be correct that less waste would have been created if not for the Government's need to increase output for the war effort. What is dispositive, though, is who made the decisions about how to increase output and what was done with any waste that was created.

23