RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0142p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

MRP PROPERTIES COMPANY, LLC; VALERO REFINING COMPANY–OKLAHOMA; PREMCOR REFINING GROUP INC.; ULTRAMAR, INC.; VALERO REFINING COMPANY–TENNESSEE LLC; VALERO REFINING–TEXAS, L.P.,
                                  *Plaintiffs-Appellees*,

    *v.*

UNITED STATES OF AMERICA,
                                  *Defendant-Appellant*.

No. 22-1789

─────────────

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:17-cv-11174—Thomas L. Ludington, District Judge.

Argued:  June 15, 2023

Decided and Filed:  June 29, 2023

Before:  SUTTON, Chief Judge; BATCHELDER and STRANCH, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Michelle Melton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, DC, for Appellant.  Jennifer C. Barks, KELLEY DRYE & WARREN LLP, Houston, Texas, for Appellees.  **ON BRIEF:**  Michelle Melton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, DC, for Appellant.  Jennifer C. Barks, KELLEY DRYE & WARREN LLP, Houston, Texas, Jill M. Wheaton, DYKEMA GOSSETT PLLC, Ann Arbor, Michigan, for Appellees.

_____

**AMENDED OPINION**

_____

SUTTON, Chief Judge.   During World War II, the federal government played a significant role in American oil and gasoline production, often telling refineries what to produce and when to produce it.   It also rationed crude oil and refining equipment, prioritized certain types of production, and regulated industry wages and prices.   All of this affected the operations of American oil companies at the time.   But did it make the United States a refinery "operator" under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601–75?  We hold that it did not and reverse the district court's contrary determination.

I.

The Allies fought the Axis largely with American supplies.   American steel built their tanks, ships, and aircraft.   American factories assembled them.   And American petroleum products, including oil and gasoline, fueled them for war.

Wartime demand led to shortages.   Congress responded.   It authorized the President to ration essential materials, to set wages and prices, to prioritize production of critical war products, to inspect defense contractors' facilities, and to requisition property for military use. *O'Neal v. United States*, 140 F.2d 908, 910–11 (6th Cir. 1944); 50a U.S.C. §§ 633, 643 (1946) (expired); An Act to Authorize the President of the United States to Requisition Property Required for the Defense of the United States, Pub. L. No. 99-274, 55 Stat. 742 (1941).

The President applied these powers with care, at least to America's oilmen.   He did not nationalize their industry or confiscate their equipment.   But he did impose wage and price controls and inspect refinery facilities, including for "[c]ontrol of dust, fumes [and] vapors." R.77-47 at 8.   And he did regulate the quantities and grades of crude oil each refinery could process, ration capital goods such as steel piping, and seize several refineries temporarily after labor disputes threatened production.   Perhaps most importantly, he told refiners what to make

and for whom to make it, demanding tractor fuel for farmers one week and aviation gasoline for the Air Force the next.

Refining oil creates sludge, slop, and other waste products. Wartime refineries burned this waste, buried it, impounded it in landfills, or kept it in vats. Leaks and spills, often managed by the refineries "by visual inspection," also released waste into the environment. R.74-32 at 56. These practices preceded the war, and the war did not end them. But to produce what the government requested using the crude oil it allotted, refineries sometimes changed their manufacturing techniques. These changes led to more waste production and corroded refinery equipment, increasing leakage and spillage. Compounding this last problem, government rationing of steel and other construction materials delayed repairs meant to address corrosion and prevent "unintended leaks, spills, and breaks." *Id.* at 50.

This case involves twelve refinery sites, all owned today by the Valero Energy Corporation or its affiliates. Each refinery operated during the war, faced wartime regulations, and managed wartime waste. After the war, inspections revealed environmental contamination at each site.

Valero started cleaning up the sites. It then sought contribution from the United States, arguing that the government "operated" each site during World War II. It did not contend that government personnel regularly disposed of waste at any of the sites or handled specific equipment there. Nor did it allege that the United States designed any of the refineries or made engineering decisions on their behalf. Valero instead claimed that the government's production directives, rationing schemes, and wartime inspections made the United States an operator of each facility.

After discovery, the district court granted partial summary judgment to Valero. It held that any reasonable juror would find that the United States operated each site during the war, emphasizing that it controlled what and how much the refineries would produce during wartime. With the permission of the district court and our permission, the United States took an interlocutory appeal. *See* 28 U.S.C. § 1292(b).

II.

As its name conveys, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, CERCLA for short, creates a national program for remediating pollution and sharing the clean-up costs among responsible parties. 42 U.S.C. §§ 9601–75. One of its key provisions makes "operator[s]" of a "facility" liable for cleaning up hazardous waste found on facility premises, sometimes long after the discharges and other pollution occurred. *Id.* § 9607(a)(1)–(2). A facility's current operators may seek contribution to pay for the remediation of the property from their predecessors. *Id.* § 9613(f)(1).

The two key terms are facility and operator. Facility includes "any building, structure, installation, equipment, pipe[,] or pipeline," along with "any site or area where a hazardous substance has . . . come to be located." *Id.* § 9601(9).

Operator means a "person . . . operating . . . [a] facility." *Id.* § 9601(20)(A)(ii). More helpfully, "an operator . . . directs the workings of, manages, or conducts" a facility's "affairs." *United States v. Bestfoods*, 524 U.S. 51, 66 (1998) (citing dictionaries). Honing the definition further, "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66–67.

Who or what counts as "conduct[ing]" or "manag[ing]" "operations . . . specifically related to pollution" and concerning the leakage or disposal of hazardous waste? One category that suffices covers those who perform day-to-day work with hazardous waste. *Id.* at 66 & n.12. Another category covers those who make strategic decisions about waste management, say by choosing to store waste onsite rather than offsite or by adopting processes that lead to leakage or spillage. *See GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 449 (6th Cir. 2004); *Am. Premier Underwriters, Inc. v. Gen. Elec. Co.*, 14 F.4th 560, 580–81 (6th Cir. 2021) (citing cases); *see also* 42 U.S.C. §§ 9601(29), 6903(3) ("disposal" includes "leaking" and "spilling" along with intentional removal or storage). By contrast, run-of-the-mill regulators, lenders, and suppliers do not amount to "operators." *United States v. Township of Brighton*, 153 F.3d 307, 315 (6th Cir. 1998) (opinion of Boggs, J.) (regulators); *id.* at 324–25 (Moore, J., concurring in the judgment)

(agreeing); *see* 42 U.S.C. § 9601(20)(F) (lenders); *Am. Premier Underwriters*, 14 F.4th at 580 (suppliers). All in all, "a person . . . 'manages' activities 'specifically related to pollution,'" and thus qualifies as an operator, where she "exercises control over the waste disposal process." *GenCorp*, 390 F.3d at 449.

Some cases illustrate the two sides of the operator line. On the one side, consider *GenCorp*. GenCorp, Inc. and the Olin Corporation built a manufacturing plant together. GenCorp helped pay for construction, its employees worked side-by-side with Olin's, and its senior management decided how the plant would dispose of toxic waste. *Id.* at 438–40. We described GenCorp as an "operator" of the plant, emphasizing "GenCorp's control over the hazardous waste" and its disposal. *Id.* at 449. Or consider *Nu-West Mining Inc. v. United States*. 768 F. Supp. 2d 1082, 1091 (D. Idaho 2011); *see Am. Premier Underwriters*, 14 F.4th at 576 (relying on *Nu-West*). The Forest Service told a mine how to design its waste dumps and where to put them. 768 F. Supp. 2d at 1089–90. That meant the United States "operated" the dumps, for it "actively manag[ed] the disposal of hazardous waste" there. *Id.* at 1091; *accord Am. Premier Underwriters*, 14 F.4th at 576.

On the other side of the line, consider *American Premier Underwriters*. General Electric designed railroad equipment to vent toxic chemicals when hot, then sold the equipment to a railroad. 14 F.4th at 565–66. That made General Electric a "service provider" but not an operator, as General Electric did not "t[ell]" the railroad "what to do" about the venting or "play [a] substantial role[] in the day-to-day operation of" the equipment. *Id.* at 580–81. Or consider *United States v. Vertac Chemical Corp.*, a case whose facts rhyme with today's. 46 F.3d 803 (8th Cir. 1995). A factory manufactured Agent Orange pursuant to official government directives and in accordance with government specifications; that said, the government did not design the factory, supply it with equipment, or "address the manner in which [it] was to handle waste[]." *Id.* at 807. The Eighth Circuit held that the United States had not "operated" the factory. *Id.* at 809.

The parties share some initial common ground in applying these principles and definitions.  They agree that Valero's refinery sites count as "facilities" and that they contain hazardous waste.  And they agree that a high-volume purchaser is not for that reason alone an operator.  They part ways over whether the United States, a high-volume purchaser and regulator, "operated" these facilities during World War II.  It did not, for several reasons.

During the war, the refineries, not the government, made the key management decisions related to waste and implemented those decisions.  Individual refineries, not the government, worked "day-to-day" with petroleum's hazardous byproducts.  *Am. Premier Underwriters*, 14 F.4th at 581.  Employees of the refinery, not the government, burned and buried toxic waste.  Employees of the refinery, not the government, manned refinery control rooms.  And employees of the refinery, not the government, maintained the refineries and monitored them for leaks or spills.  Far from "exercis[ing] control" over routine "waste disposal process[es]," government officials had little to do with them.  *GenCorp*, 390 F.3d at 449.

So too, individual refineries, not the government, made broader, strategic decisions about waste disposal.  The government did not design Valero's refineries or tell them how to process petroleum.  *Cf. Am. Premier Underwriters*, 14 F.4th at 575–81 (citing cases).  It did not tell them how to handle their waste, say by treating rather than burning it, or tell them how to supervise maintenance or refining activities.  *See id.*  And it did not instruct them about where they should locate waste disposal sites.  *Id.* at 576.  Rather, as Valero's expert admits, "[w]aste disposal was an afterthought in [the United States'] wartime control of the petroleum industry."  R.74-32 at 53.  To be sure, the government influenced refineries' business decisions during the war.  But that influence did not extend to refinery facilities' waste-related features—to how refinery "building[s], structure[s], installation[s], [and] equipment" handled or mishandled waste.  42 U.S.C. § 9601(9) (defining "facility"); *see id.* § 9601(20)(A)(ii).

Decisions from other circuits confirm this conclusion.  Case after case holds that the government's World War II demands did not give it control over waste disposal and did not make it an "operator" of American mining or manufacturing facilities.  *See, e.g.*, *PPG Indus. Inc. v. United States*, 957 F.3d 395, 403 (3d Cir. 2020) (chromite ore processing); *United States v. Sterling Centrecorp Inc.*, 977 F.3d 750, 758–59 (9th Cir. 2020) (gold mining); *Exxon Mobil*

*Corp. v. United States*, 108 F. Supp. 3d 486, 521 (S.D. Tex. 2015) (oil refining).  One of these cases, like today's, considered "the government's pervasive wartime regulation of the petroleum industry."  *Exxon*, 108 F. Supp. 3d at 521.  The court's bottom line in that case mirrors ours. "Although the government had regulatory authority over the [petroleum] industry," it did not thereby "'manage, direct, or conduct . . . operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.'"  *Id.* (quoting *Bestfoods*, 524 U.S. at 61).

A dose of common sense runs in the same direction.  Emergency rationing is a paradigmatic regulatory tool.  *See, e.g.*, 15 U.S.C. § 753(a) (1976) (expired) (petroleum rationing during 1973 oil shock).  So are orders directing manufacturers to prioritize production of key products.  50 U.S.C. § 4511.  So are mandatory inspection regimes.  *Donovan v. Dewey*, 452 U.S. 594, 600–02 (1981); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 73–76 (1970) (listing examples).  By wielding these powers, regulators do not "operate" the industries they regulate any more than "'extensive regulation' of a private company" makes the regulated party a state actor.  *Ciraci v. J.M. Smucker Co.*, 62 F.4th 278, 284 (6th Cir. 2023) (quoting *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928, 1932 (2019)).

All told, the government did not "operate" Valero's refineries during the war.

Valero attacks this conclusion along several fronts.  It says that the government told refineries what to produce and that, to produce those items, refineries altered their operations in ways that increased waste production.  But manufacturers often reorganize production in order to meet their end-users' needs.  That reality does not turn end-users into "operators."  *PPG*, 957 F.3d at 405 (holding that "a [g]overment directive to increase output during a time of war" did not make the government an operator, even when manufacturer responded by altering production processes).

Valero adds that the government managed facility inputs as well as outputs, restricting "the supply of crude oil . . . to" each refinery.  R.74-18 at 48.  That does not improve things either; controlling a facility's supply of inputs does not make the supplier an "operator."  *See, e.g.*, *PPG*, 957 F.3d at 403 (controlling supply of chromite ore to processing plant did not make

government an "operator"); *cf. Am. Premier Underwriters*, 14 F.4th at 581 (supplier of railcar components that emitted toxic substances did not "operate" railcars or components); *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 157–58 (7th Cir. 1988) (entity supplying toxic substance to factory, which it had also designed, did not "operate" factory when toxic substance leaked into groundwater). CERCLA regulates "the waste *disposal* process," not the supply of products leading to the production and disposal of waste. *GenCorp*, 390 F.3d at 449 (emphasis added).

In a similar vein, Valero observes that the wartime government rationed steel and other necessary capital goods, leading to deferred maintenance and increases in leakage. Still, again, controlling the supply of goods or services available for market does not make the controller an "operator." The government limits the domestic supply of raisins, *Horne v. Dep't of Agric.*, 576 U.S. 350, 355 (2015), but that does not make the United States an "operator" of raisin distributors or of the grocery store's raisin aisle. Many wartime industries relied on steel and thus were affected by such rationing. Were Valero correct, that would make the government, implausibly, an operator of each of those facilities. *See also Exxon Mobil*, 108 F. Supp. 3d at 526–28.

Trying to show that this was not an ordinary supplier-customer relationship, Valero emphasizes the nature of the government's wartime regulations, which left refineries with little choice about usage and production decisions. But many regulatory regimes create such pressures without making regulators "operators." Utility regulators, for instance, tell electrical utilities whom they must serve (typically everyone within their service area), what they must provide (electricity of a certain voltage, frequency, and degree of reliability) and often how they must provide it (by purchasing power from certain generators or kinds of generators). *See generally Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260 (2016); Regulatory Assistance Project, *Electricity Regulation in the US: A Guide* (2011). These mandates do not transform utility regulators into "operators" of the facilities they regulate. *Cf. Jackson*, 419 U.S. at 351.

Switching gears, Valero says that the government "required . . . [r]efineries to convert their operations" to make the government's new products. Appellees' Br. 9. But the government did not second-guess refineries' engineering decisions about how to rejigger their plants. It told the refineries to produce new products, then allowed them to create or modify the necessary production facilities. Having left the production decisions to the refineries, the government did not become their "operator." *See PPG*, 957 F.3d at 405 (finding that government did not operate chromium manufacturing facility when it directed increased output but did not choose production methods).

*FMC Corp. v. U.S. Department of Commerce* does not help Valero either. 29 F.3d 833 (3d Cir. 1994) (en banc). A synthetic rubber plant leased government-owned machinery, which a third party installed at the government's behest. *Id.* at 837. "[W]astes were generated and disposed of by the government-owned equipment," and a government representative monitored the facility employees who handled waste disposal. *Id.* at 837–39. The Third Circuit found that the United States operated the facility. But here, unlike in *FMC*, the government did not own the waste-producing equipment or supervise the waste-disposing employees.

*FMC*, it is true, describes control over "what product [a] facility would produce, the level of production, the price of the product, and to whom the product would be sold" as "leading indicia" of operator status, a framing that favors Valero. *Id.* at 843. But the Third Circuit decided *FMC* before the Supreme Court decided *Bestfoods*, and *Bestfoods* clarified that CERCLA requires control over activities "specifically related to pollution" rather than control over general pricing and product-related decisions. 524 U.S. at 66–67; *see also PPG*, 957 F.3d at 405–06 (retreating, in a subsequent Third Circuit decision, from *FMC*'s "leading indicia" language in a similar way).

Valero's remaining arguments meet a similar end. It observes that the United States capped some refinery employees' wages, but it never explains why those controls amounted to operation rather than regulation. It emphasizes that government employees inspected refineries for leaks and spills, but it does not show that those inspections made the government an operator of Valero's refineries, perhaps unsurprising because the United States sometimes faced "considerable difficulty convincing . . . management" to carry out its post-inspection

recommendations. R.94-20 at 2. And it says that the government seized one plant for six months, after the war ended, to deal with labor unrest. But it does not spell out why that seizure made the United States an "operator" of *all* of its plants, or even of the plant the government seized, during the wartime period at issue in this appeal—the position the district court took and that Valero has sought to defend.

We reverse.