RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0222p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

AMERICAN PREMIER UNDERWRITERS, INC.,

                *Plaintiff-Appellant*,

    *v.*

GENERAL ELECTRIC COMPANY,

                *Defendant-Appellee*.

> No. 20-4010

─────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:05-cv-00437—Michael H. Watson, District Judge.

Argued: July 29, 2021

Decided and Filed: September 21, 2021

Before: SUTTON, Chief Judge; SUHRHEINRICH and NALBANDIAN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Frank L. Tamulonis, BLANK ROME LLP, Cincinnati, Ohio, for Appellant. Robert J. Shaughnessy, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellee. **ON BRIEF:** Frank L. Tamulonis, Michael L. Cioffi, Thomas H. Stewart, BLANK ROME LLP, Cincinnati, Ohio, for Appellant. Robert J. Shaughnessy, WILLIAMS & CONNOLLY LLP, Washington, D.C., David W. Walulik, FROST BROWN TODD LLC, Cincinnati, Ohio, for Appellee.

─────────────

## OPINION

─────────────

NALBANDIAN, Circuit Judge. This case's story begins in the 1930s and 1940s when General Electric began designing and manufacturing certain self-propelled, electric passenger railcars that included liquid-cooled transformers. The transformers, which generated a great deal

of heat, used a coolant called Pyranol that contains toxic polychlorinated biphenyls (PCBs). GE sold some of these railcars to government entities whose trains operated on Penn Central lines. Over the years, Pyranol from the transformers escaped and contaminated four Penn Central railyards.

American Premier Underwriters, Penn Central's successor, had to pay for the costly environmental cleanup. It now seeks to shift that financial burden to GE. The district court rejected APU's arguments and we agree for three reasons: (1) GE is neither an arranger nor an operator under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA); (2) APU assigned away its contractual right to indemnification; and (3) any claims based on reassigned indemnity rights are time barred. Because these three issues decide this appeal in GE's favor, we decline to address other issues briefed by the parties. We AFFIRM.

## I.  Background

### A.  Transformers and PCBs

Penn Central owned and operated four railyards—the Paoli Yard in Pennsylvania, the Wilmington Yard in Delaware, the Sunnyside Yard in New York, and the South Amboy Yard in New Jersey—where toxic chemicals from train transformers leaked into and contaminated the environment. The self-propelled railcars used the transformers, which rested on the bottom of the railcar, to step down high-voltage current from overhead electric cables and convert it into the power needed to propel the trains. GE designed and manufactured the transformers (and the trains) that are relevant here.

Because the conversion process generated a great deal of heat, the transformers needed a coolant to function properly. Around 1940, GE began to use a coolant that it named Pyranol, which contained PCBs. GE filled the transformers with somewhere between 80 and 140 gallons of Pyranol before sale.

The coolant was essential—the transformers couldn't function without it. But as the components heated up, the coolant would expand, increasing internal tank pressure. GE designed and built the tanks to withstand pressure increases to a certain point. But because

pressure could still increase beyond that point, the tanks contained a pressure relief device—a valve that allowed Pyranol vapor, and sometimes liquid, to escape if pressure got too high. Without this protective feature, large pressure increases would have led to explosions.

While releasing ("burping") Pyranol into the environment was an "undesirable consequence," it was a "natural function of the transformer" when pressure got too high. (R. 92-2, Wharton Report, 3609; R. 99-1, Keefe Dep., 6880.)  Burp size varied, but a single burp could discharge as much as 15 gallons of Pyranol.  Besides designed-for, in-service burps, Pyranol could also leak through weld seams, bushings, bush mounts, gaskets, and seals.  Foreign objects (*e.g.*, rocks) sometimes hit the transformers and caused leaks as well.  And if not properly contained, leaking could continue after a car returned to a railyard.

Although the frequency of discharges varied, the evidence showed that, for example, in-service releases happened once a year on 61% of the popular Metroliner railcars between 1969 and 1980.  The Silverliner IV railcars stored at Paoli offer another data point.  There, the cars had an estimated 62% leak failure incident rate across ten months between 1979 and 1981. According to expert testimony, these numbers represent the higher end of the range of discharge frequency.  For some context, a typical Metroliner railcar traveled "hundreds of thousands if not . . . a million miles" each year.  (R. 92-3, Wharton Dep., 3821.)  In any event, neither party disputes that leaking railcars caused contamination at the railyards.

## B.  Knowledge of Environmental Risks

By at least 1970, GE knew that PCBs might be environmentally hazardous.  (R. 92-2, 1970 Letter, 3672 (noting that PCBs were ending up in wildlife environments and that "it is a matter of growing concern as to their effect on some species").)  And it told Penn Central that "all possible care should be taken in the application, processing and effluent disposal of these products to prevent them becoming environmental contaminants."  (R. 92-2, 1970 Letter Attachment, 3675.)  But GE defended its use of Pyranol, arguing that its deployment in "sealed apparatus[es]" minimized pollution risks. (R. 92-2, 1970 Letter, 3673.)

A few years later in 1973, a GE products safety manager acknowledged "pyranol incidents" in a letter to an environmental problems consultant.  (R. 159-1, 1973 Letter, 25591.)

The letter also summarized various "transformer improvements" that would "reduce pyranol loss." (*Id.* at 25592.) The improvements included increasing "thermal sensor . . . sensitivity" and "cooling capacity . . . [to] reduce[] the probability of overheat (and overpressure)." (*Id.*) Another option was adding a "shroud . . . to direct spill straight down to the roadbed." (*Id.*)

In 1974, GE copied Penn Central on a letter noting the "considerable concern over the effects of . . . polychlorinated biphenyl (PCB) . . . on the environment." (R. 92-5, 1974 Letter, 3927.) The letter instructed that "[e]very effort should be made to prevent the escape of PCB's into the environment and to contain all leaks or spills." (*Id.* at 3928.) And it "document[ed] suggested emergency procedures for handling . . . leakage or spills." (*Id.* at 3927.)

### C. Silverliner IV and Arrow II Railcars

Some of APU's claims relate to two specific types of railcars. In the early 1970s, the Southeastern Pennsylvania Transportation Authority (SEPTA) and the New Jersey Department of Transportation (NJDOT) contracted with GE to make new commuter railcars with transformers that Penn Central would then run on its lines. And so GE manufactured "Silverliner IV" cars for SEPTA and "Jersey Arrow II" cars for NJDOT. Silverliner IV transformers contributed to contamination at Paoli. Arrow II transformers contributed to contamination at South Amboy and Sunnyside. Neither type of railcar operated at Wilmington.

### 1. Warranty

The railcars and their components that GE sold came with a five-year warranty. The Silverliner IV and Arrow II railcars were no exception. Under the warranty, GE stationed employees at the railyards, in onsite office trailers. Along with performing warranty administration functions, these employees provided training and troubleshooting assistance to railroad personnel. But while GE employees could help with troubleshooting transformers at the railyards, they could not perform repairs themselves. (*See* R. 180-22, Paoli 1975 Memo, 27248 ("GE can <u>not</u> perform routine troubleshooting or maintenance of cars or try to run the RR maintenance facilities.").) Nor did they have the authority to discipline railroad employees or otherwise control their activities. To the extent railroad employees or their supervisors disagreed with advice from a GE employee, they were free to disregard it. And GE employees "had no

involvement at all" when it came to "control[ling] or direct[ing] railroad employees regarding the storage, handling, or disposal of transformer fluid." (R. 180-3, Keefe Dep., 26657.)

In 1974 and 1975, several warranty-covered transformers suffered failures. As a result, some Pyranol was released into the environment. GE investigated, and it determined that a "randomly occurring . . . workmanship problem" was to blame. (R. 180-17, SEPTA Letter, 27175.) It turned out that "an electrical fault and internal ground within the main transformer could cause the transformer tank to rupture." (*Id.*) To prevent future failures, GE implemented some design changes and revised its manufacturing procedures.

The railroads wanted GE to go further. They demanded that GE recall the transformers and fix the defect. But under the terms of the warranty, 25% of the transformers had to fail before a recall obligation could be triggered. This threshold was never met, and so GE declined the request. Instead, it adopted a "fail and fix" policy, which meant that GE would wait until transformers failed before repairing them consistent with the warranty. This decision was driven by financial considerations. GE reviewed the "field failure data, availability of a turn-around pool of transformers, and the cost associated to update 150 transformers." (R. 102-1, GE Letter, 7428.) And based on this information, it determined that "it will be less costly . . . not to retrofit." (*Id.*)

2. Right to Indemnification

The Silverliner IV and Arrow II contracts also included indemnity provisions. These provisions were virtually identical. GE agreed to indemnify SEPTA/NJDOT *and Penn Central* against "claims, suits, demands and causes of action of any kind or nature whatsoever . . . caused by [GE] in the manufacture, testing, inspection or repair of any of the cars, or any part thereof, whether occurring prior to or after acceptance of such car by [SEPTA/NJDOT] from the Contractor and whether occurring on or off the premises of the Railroad." (R. 92-3, SEPTA Contract, 3723-24; R. 92-3, NJDOT Contract, 3792.) The provision did "not apply to any fare-paying passenger injured while in a regular passenger car of a train." (R. 92-3, SEPTA Contract, 3724; R. 92-3, NJDOT Contract, 3792-93.)

Later in the 1970s, Penn Central underwent bankruptcy reorganization. As contemplated by the Regional Rail Reorganization Act, Conrail assumed Penn Central's assets and operations.

Penn Central's bankruptcy trustee executed a Bill of Sale in 1976 transferring substantially all of Penn Central's assets to Conrail, including "rights of whatever nature . . . used or useful in the provision of rail services" to Conrail. (R. 104-4, Bill of Sale, 7703.) Conrail did not, however, "assume[] . . . liabilities or obligations of any kind of [Penn Central] arising out of or in connection with the [transferred] rights . . . or any property which is the subject thereof, which have accrued prior to the date of delivery hereof or which thereafter arise out of events which have occurred prior thereto." (R. 104-4, Schedule H, 7717.)

Conrail later transferred ownership of some of the railyards, including Paoli, to Amtrak. *United States v. Nat'l R.R. Passenger Corp.*, No. CIV. A. 86-1094, 1999 WL 199659, at *1 (E.D. Pa. Apr. 6, 1999), *aff'd sub nom. United States v. Se. Pa. Transp. Auth.*, 235 F.3d 817 (3d Cir. 2000). After transferring Paoli ownership to Amtrak, however, Conrail continued to operate Paoli until 1983 when SEPTA took over operation. *Id.*

In 1992, the United States and (separately) SEPTA, Conrail, and Amtrak filed claims against Penn Central over the Paoli contamination. APU (successor to Penn Central) settled with SEPTA, Conrail, and Amtrak in 2004. As part of the settlement, SEPTA, Conrail, and Amtrak assigned APU "any and all claims relating to the Paoli Rail Yard Site, if any, against General Electric Company . . . or any component manufacturer of rail cars that may have contributed to contamination at the Paoli Rail Yard Site." (R. 92-4, Settlement Agreement, 3874.)

### D. Proceedings Below

In June 2005, APU sued GE for environmental response costs and other damages. Ruling on competing motions for summary judgment, the district court held that (1) GE was not liable as an arranger under CERCLA; (2) APU had transferred its indemnity rights to Conrail in 1976; and (3) claims based on indemnity rights that Conrail and SEPTA reassigned to APU in 2004 were time barred. The issue of operator liability proceeded to trial. The parties and the court agreed to try the issue based on written evidentiary proffers. The court held that GE was not an operator. APU appealed.

## II.  Standard of Review

We review questions decided on summary judgment de novo.  *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014).  "Summary judgment is appropriate if the record, when viewed in the light most favorable to the nonmovant, reveals that no genuine dispute of material fact exists and that the movant is entitled to judgment as a matter of law."  *Id.*

Here, the trial court decided the issue that it did not resolve on summary judgment on written submissions from the parties.  "In an appeal from a judgment entered after a bench trial, we review the district court's findings of fact for clear error . . . ."  *T. Marzetti Co. v. Roskam Baking Co.*, 680 F.3d 629, 633 (6th Cir. 2012).  "This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts."  *Id.* (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 565 (1985)); Fed. R. Civ. P. 52(a)(6); Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment.  We review "conclusions of law de novo."  *Id.*

The standard of review for mixed questions of law and fact is murkier.  Some of our older cases state that we review "[m]ixed questions of law and fact . . . de novo."  *T. Marzetti*, 680 F.3d at 633; *see also Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc).  But the Supreme Court has emphasized more recently that "[m]ixed questions are not all alike."  *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018).  Indeed, "the standard of review for a mixed question all depends on whether answering it entails primarily legal or factual work."  *Id.*  De novo review is appropriate when a question "require[s] courts to expound on the law, . . . by amplifying or elaborating on a broad legal standard" and "developing auxiliary legal principles of use in other cases."  *Id.*  But deference is appropriate when a question requires "immers[ion] . . . in case-specific factual issues" involving "multifarious, fleeting, special, narrow facts that utterly resist generalization."  *Id.*

The operator status question—the only issue decided at bench trial—is mixed but looks to be "fact-intensive."  *United States v. Twp. of Brighton*, 153 F.3d 307, 315 n.9 (6th Cir. 1998).  So deference might be appropriate.  *See id.* at 315 ("This inquiry is properly left to the district

court . . . .").[1]  But we need not decide this issue here—APU's operator argument fails even when reviewed de novo.

## III.  CERCLA

CERCLA makes four classes of "[c]overed persons" strictly liable for environmental contamination.  42 U.S.C. § 9607(a); *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 608 (2009).  APU argues that GE falls within two of them.

### A.  Arranger Liability

CERCLA imposes strict liability on "[a]ny person who by contract, agreement, or otherwise *arranged* for disposal . . . of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances."  42 U.S.C. § 9607(a)(3) (emphasis added).  APU argues that GE "arranged for disposal" of hazardous PCB because (1) it designed and manufactured transformers with pressure-release valves whose "natural function" was to discharge Pyranol when conditions required; (2) it knew that "[t]he frequency of minor spills [was] large"; (3) it took affirmative steps to direct spills onto the roadbed; and (4) it implemented a fail-and-fix policy for defective transformers rather than recall them. (Appellant Br. at 32-39.) We are unpersuaded.

### 1.  Legal Standard: *Burlington Northern*

Although CERCLA doesn't define "arranged for," the Supreme Court explained the appropriate standard in *Burlington Northern*.  That case decides this issue in GE's favor.

*Burlington Northern* addressed whether Shell Oil Company was an arranger that could be liable for pesticide contamination.  Shell had sold and transported the contaminating pesticide (D-D) to an agricultural chemical distributor through a common carrier.  *Burlington N.*, 556 U.S.

---

[1]The Supreme Court provided some more nuance in *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062 (2020).  It held that the "phrase 'questions of law' [as deployed in a statutory provision] includes the application of a legal standard to *undisputed* or *established* facts."  *Id.* at 1067 (emphasis added).  So it may be the case that where a district court has applied undisputed facts against a legal standard, a circuit court can review de novo.  But here, factual disputes underlie the operator status question.  For example, the parties disagree as to whether GE employees "'supervised' maintenance and repair of GE-made transformers."  (Appellee Br. at 47.)

at 603. At first, it had done so by shipping 55-gallon drums. *Id.* But Shell eventually switched to bulk sales and required purchasers "to maintain bulk storage facilities for D-D." *Id.* This, because "Shell found it economically advantageous . . . to require . . . bulk storage" rather than "shipping in drums." *Id.* at 621 (Ginsburg, J., dissenting). And "[b]ecause D-D is corrosive, bulk storage of the chemical led to numerous tank failures and spills as the chemical rusted tanks and eroded valves." *Id.* at 603 n.1.

Bulk storage also required transferring D-D "from tanker trucks to a bulk storage tank" when the product arrived, *id.* at 603, using equipment that Shell "specified [for] transferring the chemicals," *id.* at 621 (Ginsburg, J., dissenting). After that, the distributor had to transfer the chemical from the bulk storage tank "to bobtail trucks, nurse tanks, and pull rigs." *Id.* at 603-04. "During each of these transfers leaks and spills could—and often did—occur." *Id.* at 604; *see also id.* at 621 (Ginsburg, J., dissenting) (noting "spills . . . were inevitable" and "occurred every time deliveries were made"). And Shell knew that. *Id.* at 604. In fact, "[a]ware that spills of D-D were commonplace among its distributors, . . . Shell took several steps to encourage the safe handling of its products" like providing safety manuals, instituting a voluntary discount program for distributors who made improvements, and requiring distributors to obtain inspection by a qualified engineer. *Id.*

The Supreme Court held that these facts did not make Shell an arranger. Because CERCLA leaves "arranged for" undefined, the Court looked to ordinary meaning. *Id.* at 611. "In common parlance, the word 'arrange' implies action directed to a specific purpose." *Id.* And so it concluded that "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Id.* "[S]tate of mind" thus plays an "indispensable role" in the arranger analysis. *Id.* (quoting *United States v. Cello-Foil Prod., Inc.*, 100 F.3d 1227, 1231 (6th Cir. 1996)).

Because the focus is "intentional . . . dispos[al] of a hazardous substance," CERCLA liability attaches to "an entity [that] enter[s] into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance." *Id.* at 610-11. But it does not attach to "an entity [that] merely" sells "a new and useful product" to a purchaser who "later, and unbeknownst to the seller, dispose[s] of the product in a way that [leads] to contamination." *Id.*

at 610. Whether it attaches to "the many permutations of 'arrangements' that fall between these two extremes" on the arranger-liability spectrum, however, is "less clear." *Id.*

In those "cases in which the seller has some knowledge of the buyers' planned disposal or whose motives for the 'sale' of a hazardous substance are less than clear," a "fact-intensive inquiry" applies. *Id.* Courts are tasked with "look[ing] beyond the parties' characterization of the transaction as a 'disposal' or a 'sale' and seek[ing] to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." *Id.*

The question of Shell's liability in *Burlington Northern* forced the Supreme Court to address one of the many permutations of "arrangements" that fall between the extremes on the arranger-liability spectrum. It held that Shell was not an arranger.

Foreseeability alone could not support arranger liability. *See id.* at 612. And so the fact that Shell knew spills were commonplace was not enough. *See id.* ("[K]nowledge alone is insufficient to prove that an entity 'planned for' the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product."). To become an arranger, Shell needed to "have entered into the sale of the D-D with the *intention* that at least a portion of the product *be disposed of* during the transfer process." *Id.* at 612 (emphases added). And the "evidence [did] not support an inference that Shell intended such spills to occur" despite its knowledge that "minor, accidental spills occurred." *Id.* at 612-13. "To the contrary, the evidence revealed that Shell took numerous steps to encourage its distributors to *reduce* the likelihood of such spills . . . ." *Id.*

## 2. This Case

The facts here sit somewhere between the two extremes of *Burlington Northern*'s arranger spectrum. GE's "sole purpose" wasn't to "discard[] a used and no longer useful hazardous substance." *Id.* at 610. And although the Pyranol-filled transformers were sold as "useful products," this is not a case in which "the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination." *Id.* Pyranol release was both foreseeable and anticipated. So we must conduct a "fact-intensive inquiry" that "looks beyond the parties' characterization of the transaction as a 'disposal' or a

'sale' and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict-liability provisions." *Id.* *Burlington Northern*, a murky middle case itself, tells us that the arrangement here does not trigger strict liability.[2]

Arranger liability requires a party to "take[] intentional steps to dispose of a hazardous substance." *Id.* at 611. APU argues that GE took those steps here when it: (1) designed and manufactured transformers with a release valve for releasing Pyranol pressure buildup; (2) added a shroud to direct spills straight onto the roadbed; and (3) adopted a fail-and-fix policy rather than recall transformers. APU also argues that GE did so with knowledge that spills would occur and Pyranol might be environmentally hazardous. These facts fall short.

The "specific purpose," *id.* at 611, of selling transformers with release valves wasn't to get rid of an undesirable waste product—it was to release pressure and avoid tank rupture. The transformers needed Pyranol. They could not safely use Pyranol without a pressure release valve, and release was an "undesirable consequence." (R. 92-2, Wharton Report, 3609; *see* R. 92-2, Evans Dep., 3623.) And although GE knew that spills sometimes happened, awareness of "commonplace," *Burlington N.*, 556 U.S. at 604, even "inevitable," *id.* at 621 (Ginsburg, J., dissenting), spills alone are not enough under *Burlington Northern*.

Further, GE, like Shell, tried to minimize undesirable loss of Pyranol into the environment. It told Penn Central that "all possible care should be taken in the application, processing, and effluent disposal of these products to prevent them becoming environmental contaminants." (R. 92-2, 1970 Letter Attachment, 3675.) It also made improvements to transformers to "reduce pyranol loss" like increasing "thermal sensor . . . sensitivity" and "cooling capacity . . . [to] reduce[] the probability of overheat (and overpressure)." (R. 159-1, 1973 Letter, 25592.) And although including a "shroud . . . to direct spill straight down to the roadbed" on the list of improvements may have been shortsighted, (*id.*), it's clear in context that the shroud's purpose was not to facilitate loss or contamination. The point of the shroud, and all other modifications on that list, was to *reduce* Pyranol loss into the environment (perhaps by

---

[2]APU contends that the trial court erred in not holding that GE is liable as a matter of law as an arranger.

ensuring it would spill onto the track rather than, for example, surrounding plants). So the shroud, too, cuts against liability.

Holding GE liable here would be analogous to holding Shell liable simply for changing its delivery method in a way that it knew would lead to spills. In both cases, environmental contamination was foreseeable, not the goal. So this does not look like an "arrangement . . . Congress intended to fall within the scope of CERCLA's strict-liability provisions." *Burlington N.*, 556 U.S. at 610.

Nor does GE's choice to adopt a fail-and-fix policy change the analysis. Nothing suggests that GE's goal in adopting that policy was to facilitate Pyranol disposal. Indeed, APU doesn't even argue that. The choice was a financial one; waiting for failure was cheaper than fixing all the transformers that might be defective. So while failure and possible associated spills may have been foreseeable when GE made this policy choice, foreseeability alone is insufficient. *See Burlington N.*, 556 U.S. at 612. GE did not implement the policy "with the intention that at least a portion of the product be disposed of." *See id.* Disposal was not the goal.

### 3. Useful Products and Design

Several cases emphasize the distinction between useful products and waste, and they also support our holding. Like *Burlington Northern*, these cases recognize "the indispensable role that state of mind must play" in the arranger analysis. *Burlington N.*, 554 U.S. at 611 (quoting *Cello-Foil*, 100 F.3d at 1231). They recognize that arranger liability is often inappropriate when "disposal occurs as a peripheral result of the legitimate sale of an unused, useful product" even if a seller "know[s] its product will [ultimately] be leaked, spilled, dumped, or otherwise discarded." *Id.* at 612.

Take *AM International*, which dealt with the transfer of a manufacturing facility that contained useful but dangerous chemicals. *AM Int'l, Inc. v. Int'l Forging Equip. Corp.*, 982 F.2d 989, 991-92, 998-99 (6th Cir. 1993). The buyer never used the chemicals, and the chemicals eventually contaminated the surrounding environment. *Id.* There, we ruled that "no arrangement for disposal of hazardous wastes has taken place where there has been a conveyance of a 'useful, albeit dangerous product, to serve a particular, intended purpose.'" *Id.* at 999 (quoting

*Prudential Ins. Co. of Am. v. U.S. Gypsum*, 711 F. Supp. 1244, 1255 (D.N.J. 1989)). And we concluded there was no arranger liability because "the chemicals were not left at the facility with disposal in mind." *Id.*

Similarly, the Ninth Circuit observed that "[i]t would be odd . . . to say that an auto parts store sells motor oil to car owners *for the purpose* of disposing of hazardous waste." *Team Enterprises, LLC v. W. Inv. Real Estate Tr.*, 647 F.3d 901, 908 (9th Cir. 2011). That label fits better when "persons sell[] or otherwise arrang[e] for the transfer of hazardous waste [that] no longer serves any useful purpose." *Id.* And the Fifth Circuit held that a seller that "played a key role in designing [a] dry cleaning facility" and its drainage system was not an arranger even though it "knew that water separators designed to release wastewater, but not [a hazardous substance contained in dry cleaning equipment called] PERC, into the sewer were not completely effective." *Vine St. LLC v. Borg Warner Corp.*, 776 F.3d 312, 314 (5th Cir. 2015). Arranger liability was inappropriate there because "as a whole, it [was] clear that the transaction centered around the successful operation of a dry cleaning business—not around the disposal of waste." *Id.* at 319. Not only was "PERC . . . expensive," the parties had taken "steps to preserve as much PERC as possible." *Id.* at 314-15.

Compare and contrast with those cases in which liability was or might have been appropriate. Take *Cello-Foil*—a mixed-motive case. There, parties had bought solvents in reusable drums and paid a deposit fee. *Cello-Foil*, 100 F.3d at 1230. They had then returned drums with up to ten gallons of unused solvent to the seller in exchange for the return of their deposits. *Id.* Under these facts, we held that a genuine issue of material fact existed as to intent to arrange for disposal of waste. *Id.* at 1233. We explained that while the "primary purpose of the drum return arrangement was to regain the deposit," "a trier of fact could infer that Defendants were taking affirmative acts to dispose" of the hazardous waste "[b]y leaving amounts of solvents in drums ranging from one-half to ten gallons, which Defendants knew [the seller] would carry away." *Id.*

And the First Circuit determined arranger liability was appropriate where it was clear that a seller/shipper (GE) viewed the impure, low-quality scrap Pyranol involved as "waste material." *United States v. Gen. Elec. Co.*, 670 F.3d 377, 385-91 (1st Cir. 2012). There, not only had GE

labeled the Pyranol as "scrap" or "waste," it had disposed of the Pyranol in other ways—such as by sending it to landfills and instructing employees to use it as weedkiller. *Id.* at 385. GE had also continued to deliver the Pyranol to the buyer over a long time without receiving payment. *Id.* at 388. And it had refused to retrieve or test when the buyer complained about the quality of the Pyranol because "any profit [GE] derived from selling scrap Pyranol . . . was subordinate and incidental to the immediate benefit of being rid of an overstock of unusable chemicals." *Id.* at 385.

The facts here fit with those cases in which liability did not attach because the arrangement centered on a useful product. GE did not put Pyranol in its transformers or include a pressure valve "with disposal in mind." *See AM Int'l*, 982 F.2d at 999. The Pyranol here was not "scrap" or "waste" Pyranol. *See Gen. Elec. Co.*, 670 F.3d at 385. And nothing suggests that a desire to get rid of Pyranol motivated GE. *See id.*; *Cello-Foil*, 100 F.3d at 1230. Pyranol was a "useful, albeit dangerous product" with an "intended purpose." *See AM Int'l*, 982 F.2d at 999 (citation omitted). The useful Pyranol product was essential. And GE could not safely fill the transformers with that coolant without including a pressure release valve. If anything, GE "took steps to preserve," not lose the essential coolant. *See Vine St.*, 776 F.3d at 314-15. "[A]s a whole, it is clear that the transaction [here] centered around the successful operation of [trains]—not around the disposal of waste." *See id.* at 319.

Cases about product design do not suggest a different conclusion. Compare this case with one that APU relies on, *United States v. Washington State Dep't of Transp.*, 716 F. Supp. 2d 1009 (W.D. Wash. 2010). There, the district court found that WSDOT qualified as an arranger and could be held liable for contamination caused by highway runoff. *Id.* at 1015. This, because WSDOT had designed the drainage systems that disposed of waste in nearby bodies of water. *Id*. The court reasoned that arranger status was appropriate because WSDOT knew that the runoff contained hazardous substances, "[d]esigning is an action directed to a specific purpose," and the "purpose" of the designed system "was to discharge the highway runoff into the environment." *Id.*

GE's design purpose is distinguishable from WSDOT's. WSDOT's purpose was to move wastewater into the environment. *See id.* In contrast, GE's purpose was to enable the

transformers to function safely, not facilitate "discharge" of waste "into the environment." *See id.* GE didn't design the transformers and attached valves to be "a waste disposal machine." *See Team Enterprises*, 647 F.3d at 909. Arranger liability is inappropriate here.

## B. Operator Liability

CERCLA imposes strict liability on "any person who . . . owned or operated any facility" where "hazardous substances were disposed" "at the time of disposal." 42 U.S.C. § 9607(a)(2). APU argues that GE qualifies as an operator of the transformers, the railcars, and the railyards for several reasons: (1) GE designed and manufactured the transformers; (2) it stationed employees in onsite office trailers at the railyards to train, direct, and oversee transformer and railcar maintenance per a warranty agreement; (3) it decided the how, when, and if of repairs; (4) it repaired the machines at GE facilities when onsite repairs were not feasible; (5) failure to notify GE of issues could impact warranty coverage; and (6) GE's fail-and-fix policy shows post-sale control. We are unpersuaded.

### 1. Legal Standard

CERCLA defines "operator" as "any person . . . operating [a] facility." 42 U.S.C. § 9601(20)(A)(ii). The Supreme Court has called this circular definition "useless[]." *United States v. Bestfoods*, 524 U.S. 51, 66 (1998).

The one useful thing about the definition is its inclusion of the term "facility." CERCLA defines that term to encompass "any . . . equipment . . . storage container, motor vehicle, rolling stock, or . . . any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). But because CERCLA does not define "operating," this definition of "facility" doesn't get us far.

So the Supreme Court has done its "best . . . to give [operator] its 'ordinary or natural meaning.'" *Bestfoods*, 524 U.S. at 66 (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995)). "[A]n operator" for CERCLA purposes "is simply someone who directs the workings of, manages, or conducts the affairs of a facility." *Id.* But given "CERCLA's concern with environmental contamination," the operation must relate to that subject matter: "[A]n operator

must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66-67. And because "the statute obviously meant something more than mere mechanical activation of pumps and valves," operation includes "exercise of direction over [a] facility's activities." *Id.* at 71.

In the wake of *Bestfoods*, this Circuit adopted an "actual control" test to help resolve whether an entity is an operator. *Brighton*, 153 F.3d at 314. Under that test, a party must also "perform affirmative acts" to be an operator. *Id.* "The failure to act, even when coupled with the ability or authority to do so, cannot make an entity into an operator." *Id.* But once a party takes an affirmative action that makes it an operator, its inaction about a *"particular* hazard" does not save it from liability. *Id.* at 315. As helpful as the "actual control" test may be, we have also clarified that the test does not supplant the "primary question [of] whether" an entity's "activities satisfy the ordinary meaning of the term 'operation.'" *Id.* at 313. This is a "fact-intensive inquiry" in which courts "should look to the results we and others have reached" under "the facts we have found most dispositive in" those cases. *Id.* at 315 n.9. This of course requires viewing the "totality of the circumstances." *Id.* at 327 (Moore, J., concurring). And while many factors may be useful in analyzing the totality of circumstances, we have adopted no binding list of factors. *See id.* at 315 n.9; *id.* at 327 (Moore, J., concurring) ("District courts should weigh these factors, as well as any other factors indicative of actual control . . . .").

## 2. Totality of the Circumstances and Design

In its opening brief, APU contends that the district court failed to look to the totality of the circumstances when deciding this issue because the court failed to weigh GE's role as designer along with the other evidence. More specifically, APU argues the district court "improperly segregate[d]" design from other factors supporting operator liability. (Appellant Br. at 53.) Even if this argument has any merit, it is not an argument that APU can now make as an independent basis for error because APU's trial brief framed the operator issue exactly how the district court did. And "a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit." *Harvis v. Roadway Exp. Inc.*, 923 F.2d 59,

60 (6th Cir. 1991).  But regardless, as discussed below, the authorities that APU relies on do not support its claim of error.

### 3.  Operator Cases

*Brighton* tells us to "look to . . . the facts [courts] have found most dispositive" in reaching "results" in other cases when we do the "fact-intensive [operator] inquiry."  153 F.3d at 315 n.9.  A few cases provide helpful comparators.

First, *GenCorp, Inc. v. Olin Corporation*, 390 F.3d 433 (6th Cir. 2004).  That case dealt with GenCorp and Olin, two corporations with a "business relationship that defies easy categorization."  *Id.* at 437.  "By agreement of the parties, Olin built a manufacturing plant with GenCorp's assistance that for more than a decade supplied GenCorp with a [needed] chemical."  *Id.*  Olin held the title to the plant.  *Id.* at 438.  But GenCorp paid for half of the construction costs.  *Id.* at 449.  "[T]he engineering specifications for the plant were 'subject to the approval' of both GenCorp and Olin."  *Id.* at 438.  The companies created a joint committee (two representatives from each) to "oversee[] the construction, operation and management of the . . . plant."  *Id.*  That committee approved design plans that dealt with the disposal of chemical residues.  And both companies supplied labor when things were up and running: GenCorp provided the hourly workers, and Olin supplied most of the salaried.  *Id.* at 439.  Under these facts, we observed in passing (it was an arranger case, not an operator one) that "the district court permissibly concluded that GenCorp was an 'operator' of the" plant.  *Id.* at 449.

Second, *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155 (7th Cir. 1988) (Easterbrook, J.).[3]  Edward Hines Lumber Company ran a wood processing business.  *Id.* at 155.  It contracted with Osmose Wood Preserving to build a processing plant, and hazardous chemicals from the plant ended up contaminating the surrounding environment.  *Id.* at 156.

---

[3]The Seventh Circuit decided *Hines* before *Bestfoods*, but Judge Easterbrook's reasoning matches the Supreme Court's.  And we cited *Hines* approvingly in *Brighton*.  *Compare Brighton*¸ 153 F.3d at 314 ("The definition of 'owner or operator' . . . must come from a source other than the text.  The circularity strongly implies, however, that the statutory terms have their ordinary meanings rather than unusual or technical meanings." (quoting *Hines*, 861 F.2d at 156)), *with Bestfoods*, 524 U.S. at 66 ("Here of course we may again rue the uselessness of CERCLA's definition of a facility's 'operator[,]' . . . which leaves us to do the best we can to give the term its 'ordinary or natural meaning.'" (quoting *Bailey*, 516 U.S. at 145)).

Osmose designed the plant, built it, licensed Hines to use the Osmose trademark, and taught Hines's workers how to use the machinery. *Id.* Osmose promised that the plant would prevent "toxic preservative . . . escape." *Id.* Hines gave Osmose full access to the plant to police product quality. *Id.*

But this was not enough for operator liability. "The statute does not fix liability on slipshod architects, clumsy engineers, poor construction contractors, or negligent suppliers of on-the-job training." *Id.* at 157. Nor, for that matter, even entities that "might have been all four rolled into one." *Id.* Although Osmose had designed the facility, "[t]hereafter Hines had day-to-day control" over "hiring employees, deciding how much to produce," and "where to sell it and at what price." *Id.* at 158. "Osmose hovered in the background, concerned about the quality of the finished product, which could affect its reputation, but did not interfere with operational decisions." *Id.* "[A]t most," "[i]t had" "a limited veto power—if the product was not up to snuff, Osmose could . . . deny Hines the right to use its trademark." *Id.*

Third, *Nu-West Mining Inc. v. United States*, 768 F. Supp. 2d 1082 (D. Idaho 2011). The *Nu-West* court determined that the federal government qualified as an operator of mining-waste dumps on National Forest land. *Id.* at 1091. The government had issued Nu-West Special Use Permits to construct waste dumps next to four mine sites. *Id.* at 1085. "Before any mining could begin, the Government required the Lessees [Nu-West] to obtain its approval of plans for mining, waste disposal, and reclamation." *Id.* at 1086. And the government didn't simply rubber-stamp the waste dumps' design. It "manag[ed] the design and location of the waste dumps." *Id.* at 1089. Not only that, it rejected Nu-West's plans to put the dumps in other locations by saying, "you'll do it our way or not at all." *Id.* After mining and dumping began, the government "regularly inspected the mines to ensure compliance with the mining plans and waste disposal guidelines." *Id.* at 1090. And its "suggestions" carried the weight of commands. *Id.* at 1091. "[I]f the Forest Service Representative said he wanted something, that's the way it was." *Id.* "[S]uggestions often got instant results." *Id.* at 1091. The court held that this level of "active[] involve[ment] in the design and location of the waste dumps, and in ensuring that the waste dumps complied with the mining plans and environmental rules" was enough for operator liability. *Id.*

Fourth, *Exxon Mobil v. United States*, 108 F. Supp. 3d 486 (S.D. Tex. 2015). Exxon's predecessors had produced high-octane aviation gas (avgas) under federal oversight at some chemical plants and refineries. *Id.* at 490-91. There was significant contamination, and Exxon sued the federal government under CERCLA to get it to pay for the cleanup. *Id.* The court concluded the government was an operator at the chemical plants, but not at the refineries.

At the refineries, the government had simply "played the role of a very interested consumer." *Id.* at 523. "While the government had seizure authority, it did not seize, or threaten to seize, either the Baytown or Baton Rouge refineries." *Id. at* 524. In fact, "Exxon's predecessors appeared to be willing partners enthusiastic to support the nation's defense needs." *Id.* Nor was there any evidence that the parties had contracted about waste disposal at the refineries. *Id.* at 525. And the oil companies, not government employees had run day-to-day refinery operations. *Id.* At most, the government had stationed an employee at one refinery to inspect product quality. *Id.* at 526. But that employee had no role in "day-to-day management of the refinery or . . . waste disposal or environmental compliance." *Id.* And the government had no role in such things as "design[ing], specif[ying], or provid[ing] equipment." *Id.*

At the chemical plants, however, the government had acted as an operator. The government "approved the designs . . . for the . . . plants." *Id.* at 531. It required the oil companies to get "government approval for, among other things, any plant-related expenditure exceeding $1,000; the disposal of waste, scrap, byproducts, and surplus materials and equipment; additions or alterations to the plants; and increasing employee salaries and benefits." *Id.* The government stationed an employee at one plant who "played a substantial role in overseeing day-to-day operations." *Id.* And it also "made specific decisions about waste disposal and environmental compliance at the plants." *Id.*

### 4.  This Case

To be an operator, GE must have had "actual control" over and "perform[ed] affirmative acts," *Brighton*, 153 F.3d at 314, at a facility where "hazardous substances were disposed of" "at the time of disposal," 42 U.S.C. § 9607(a)(2). Because CERCLA defines "facility" capaciously, there are three possible kinds of facilities at issue: railyards, railcars, and

transformers. *See* 42 U.S.C. § 9601(9); *see also Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 750 (7th Cir. 1993) (Posner, J.) ("[T]the statute defines 'facility' so broadly that it could be thought to include a can of lye."). Because GE lacked "actual control" over the railyards, railcars, or transformers at the polluted sites, it was not a CERCLA operator.

### a. Factual Findings

Consider the factual findings, which we review for clear error. *See T. Marzetti*, 680 F.3d at 633. Penn Central operated railyards, and it used railcars (and transformers) "designed and manufactured by GE." *Am. Premier Underwriters, Inc. v. Gen. Elec. Co.*, 481 F. Supp. 3d 669, 670-71 (S.D. Ohio 2020). "Each transformer was essentially a tank with various attachments coming out of it." *Id.* at 672. "GE designed the tank to accommodate increased pressure, and avoid a potential explosion, by including a pressure relief valve on the transformers." *Id.* Although APU argues all four yards are at issue—Sunnyside, Wilmington, South Amboy, and Paoli—most of the evidence relates only to Paoli. *See id.* at 678.[4]

Railcars and transformers. Looking to testimony of an APU foreman and a GE technician, both of whom worked at Paoli, the district court found that railroad employees, not GE employees, drove the railcars and "performed any maintenance and repairs on the Railcars." *Id.* at 678. GE employees "merely trained and assisted the Penn Central employees" by "offer[ing] advice . . . about identifying a Railcar's issues" and "recommend[ing] methods to repair a Railcar's problems, given that Penn Central's shop foreman had *exclusive* authority over the railroad employees' actions as they performed maintenance and repairs on the Railcars." *Id.* at 678-79.

Railyards. The district court found that GE's role was limited to administering the railcar warranty. Penn Central "determined the staffing decisions, equipment to be used, services to be offered, commuter schedules, and railcar inventory." *Id.* at 681. And Penn Central "performed all hands-on maintenance and repairs." *Id.* As warranty administrators, "GE technicians proposed maintenance schedules for the Railcars, which Penn Central generally accepted and

---

[4]APU claims GE was an operator at each railyard, but it mainly points to testimony about Paoli. We assume for this appeal that GE's presence at the other sites mirrored its presence at Paoli. Operator liability is inappropriate at the other three sites as well.

followed. Similarly, GE technicians could recommend—but not order—that Penn Central remove a malfunctioning Railcar." *Id.*

The record supports the district court's factual conclusions. GE's activities at Paoli were a way to fulfill its contractual obligations, not a means to controlling the railyards, railcars, or transformers. APU had contracted with GE to provide onsite instruction to railroad employees. To provide that service, it placed a GE trailer and onsite employees at the railyard. Albert Keefe, a former Paoli Yard site manager for GE, testified that GE's staff were warranty administrators—they provided training for the railroad workers and helped them diagnose problems with GE products. Under the APU's union contracts, GE's team could not work on the equipment themselves. They had no authority to supervise, manage, direct, or discipline the railroad workers. And they had no authority to control the release of transformer fluid.

Keefe described his role as a "technical advisor." (R. 180-3, Keefe Dep., 26649.) GE was supposed to teach the railroad workers to diagnose problems themselves by walking them through the process step-by-step. Then, the railroad workers would perform the repairs. That was the model, at least. But often, APU didn't even consult GE before putting malfunctioning cars into service.

John Evans, Paoli railroad foreman, provided similar testimony. He explained that GE's role was to train the railroad workers and help them diagnose problems until the warranty expired or the workers could perform the repairs unassisted. He confirmed that GE had no authority over the railroad workers and that they were free to disregard GE's advice. The following exchange is particularly illuminating:

> Q . . . Mr. Evans, can you tell me in your own words what information you know that supports or confirms the idea that General Electric managed and directed the operation, repair and maintenance of rail car transformers?
>
> A If a transformer failed, and the GE service representative was . . . involved in it, they were there when we . . . took the transformer into the shop and had it changed to . . . drop it, or to do any kind of miscellaneous repairs on it.
>
> Q Does that complete your answer?
>
> A That—that basically was their—they didn't manage the people, they merely assisted the trouble shooters in developing the problem area, and then certainly

when we brought the car into the shop they were there when we . . . changed the transformers.

(R. 180-1, Evans Dep., at 26537.)

APU criticizes the district court for relying on Keefe and Evans's testimony, and it characterizes the district court's factual conclusions as an "unfinished painting." (Appellant's Br. at 66.) But the other evidence APU points to fails to show that the district court's findings were clearly erroneous.

APU looks first to the testimony of GE employee Lorne MacMonagle. He testified—like Keefe and Evans—that GE would give the APU "advice and counsel" about how to conduct repairs. (R. 180-5, MacMonagle Dep., 26744.) And he confirmed that "evaluation and determination of repairs required was a primary responsibility of General Electric with respect to the transformers" and that "[i]t was also an ongoing primary responsibility of General Electric to determine the types of repairs needed for the transformers," including any Pyranol leaks. (*Id.* at 26740, 26755.) But this only shows that GE was responsible for advising and training railroad employees, as Keefe and Evans testified. His deposition is clear that testing and repairs at Paoli were "done by the railroad personnel," not GE employees. (*Id.* at 26742.) GE personnel provided "guidance" and "offer[ed] instruction." (*Id.*)

APU also points to testimony by APU executive James Kennedy. He testified that GE decided when to take railcars in and out of service. But unlike Keefe and Evans, both of whom worked on the ground at Paoli, Kennedy didn't have firsthand knowledge. His testimony was based "entirely . . . on . . . interpretation of documents." (R. 180-2, Kennedy Dep., 26587.) And his grasp of on-the-ground facts is questionable. Not only was he unaware of any union restrictions on GE's ability to work directly on the equipment, he stated, incorrectly, that GE had direct supervisory authority over railroad employees. The district court did not err by relying on Keefe and Evans.

Finally, APU stresses that the warranty was conditioned on APU following GE's advice when making repairs. That's true. So GE's advice did carry some weight. But ultimately, APU

remained free to ignore GE's advice if it wanted. The district court did not clearly err in reaching its factual conclusions.

### b. Operator Conclusion

The district court's factual findings support its conclusion that GE did not operate the transformers, railcars, or railyards.[5] GE designed, manufactured, and sold the transformers and railcars. And given the warranty agreement and GE's expertise, GE involvement at the railyards continued post-sale. Viewing the totality of GE's involvement from the drawing board to warranty expiration, GE did not exert sufficient control to qualify as an operator.

GE's role as designer is relevant only as far as it informs whether GE "direct[ed] the workings of, manage[d], or conduct[ed] the affairs of a facility . . . . specifically related to pollution." *See Bestfoods*, 524 U.S. at 66; *see also GenCorp*, 390 F.3d at 438-39, 449. But design is insufficient by itself to generate liability; CERCLA liability attaches to operators, not designers. *See* 42 U.S.C. § 9607(a)(2); *Hines*, 861 F.2d at 157 ("The statute does not fix liability on slipshod architects, clumsy engineers, poor construction contractors, or negligent suppliers of on-the-job training . . . .").

Here, design does lend some support to APU's arguments about GE's post-sale involvement. GE designed complex equipment that sometimes required expertise in maintenance and repairs beyond the ken of Penn Central employees. And to help with service and repair, GE stationed employees at railyards. They also performed work on machinery off-site. The transformers appear to have been especially complicated; Keefe testified that they were too complex to repair onsite. "We just couldn't do that. So, the [offsite GE] service shops would handle [a transformer] repair, if necessary." (R. 180-3, Keefe Dep., 26626.) Design appears to provide a *reason* for GE's continuing post-sale involvement. But it doesn't get APU further than that. Unlike other cases in which design was relevant, here the design is not coupled with pervasive post-design operation.

---

[5]It bears repeating that we assume that GE's involvement at the three other yards mirrored involvement at Paoli—the yard with the most evidence.

After sale, onsite GE employees "merely trained and assisted the Penn Central employees" by "offer[ing] advice . . . about identifying a Railcar's issues" and "recommend[ing] methods to repair a Railcar's problems." *Am. Premier Underwriters*, 481 F. Supp. 3d at 678-79. True, GE's advice carried some weight given the possibility of voiding a valuable warranty. But ultimately, Penn Central employees, not GE's, ran and serviced the equipment at the railyards. When a workmanship defect caused a class of its transformers to experience higher rates of failure, GE declined to recall. Instead, it adopted a fail-and-fix policy, which was permissible under the warranty agreement.

Compare GE's involvement with other operator cases. In *Nu-West*, the company had to have federal approval to mine on federal land. The government required Nu-West to "do [waste disposal sites the government's] way or not at all." *Nu-West*, 768 F. Supp. 2d at 1089. And the government "regularly inspected the mines to ensure compliance with the mining plans and waste disposal guidelines." *Id.* at 1090. But here, APU was free to ignore GE's advice. Penn Central took GE's advice seriously given the specter of warranty loss, but its advice did not carry the weight of "a regulator" "suggest[ing] modifications in light of requirements imposed by law." *See Nu-West*, 768 F. Supp. 2d at 1090.

In *GenCorp*, the companies collaborated in the design, construction, and operation of a plant. *See* 390 F.3d at 449. They created a joint committee to oversee those activities, and both supplied labor when the plant was up and running. *See id.* at 438-39. But here, GE was just a service provider, and it was performing its contractual duty.

That contractual, service-providing relationship makes GE more like Osmose in *Hines*. 861 F.2d at 158. Osmose had built part of the plant for Hines, trained the workers, and reserved for itself a limited access right to ensure that the product was "up to snuff." *Id.* at 158. Even though Osmose could pressure Hines in various ways—through its inspection right, its ability to revoke permission to use its trademark, and its control of the chromated copper arsenate Hines needed to make its goods—it still wasn't an operator. *Id.* at 158. Here, the activities APU says gave GE control over the facilities were obligations to provide a service to APU. And GE has even less power than Osmose in *Hines*. It could not revoke Penn Central's right to use the equipment. All it could do was void the warranty.

Turn next to *Exxon Mobil*. There, the court found that the government was an operator of chemical plants because the government approved the design and required the oil companies to get government approval for various matters, including "the disposal of waste, scrap, byproducts, and surplus materials and equipment." *Exxon Mobil*, 108 F. Supp. 3d at 531. The government also stationed an employee at a plant who "played a substantial role in overseeing day-to-day operations." *Id.* And it "made specific decisions about waste disposal and environmental compliance at the plants." *Id.* That's not this case. Here, onsite GE employees did not play substantial roles in the day-to-day operation of transformers, railcars, or railyards; they just helped troubleshoot and gave instruction for feasible onsite repairs. Penn Central did not need GE's approval for disposing of waste products. Beyond designing and selling a product that required Pyranol and an emergency valve to operate safely, GE had no say on matters related to "waste disposal and environmental compliance" at the railyards. *See id.*

This case is far more like the refineries where the *Exxon Mobil* court determined operator liability was inappropriate. The oil companies, not the government, had run the day-to-day operations and decided on waste disposal. *Id.* at 525. At most, the government had seizure authority (that it never threatened to use) and employees stationed at the refineries to inspect product quality. *Id.* at 524, 526. Here, Penn Central ran the day-to-day operations, and APU points to no evidence showing GE involvement in waste disposal decisions. Moreover, in *Exxon Mobil*, the court declined to find operator liability even though the government was involved in part at the refineries *and had seizure authority*. *Id.* at 525. GE had no such authority. It had the power to void a warranty, requiring Penn Central to pay for any needed repairs and advice. That's hardly the level of control required by *Bestfoods*, which requires "manag[ing], direct[ing], or conduct[ing] operations." 524 U.S. at 66-67.

Finally, consider the fail-and-fix policy, which APU contends supports operator liability. *Brighton* tells us that a party "must perform affirmative acts" to be an operator. 153 F.3d at 314. "The failure to act, even when coupled with the ability or authority to do so, cannot make an entity into an operator." *Id.* Because GE's policy was just a "failure to act," the fail-and-fix policy does not show operation.

The facts here amply support the district court's conclusion. GE did not operate the transformers, railcars, or railyards. But even if we're wrong about that, APU would still lose here. More than abstract operation is required.

Because of "CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations *specifically related to pollution*, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66-67 (emphasis added). But the facts don't show that GE's onsite warranty-administration activities had anything to do with pollution, hazardous waste, or environmental compliance. GE's post-sale role at the railyards was to help get malfunctioning railcars back on the rails. That the railcars' transformers contained a toxic chemical does not show that GE "manage[d], direct[ed], or conduct[ed] operations specifically related to pollution." *See id.* Nothing APU points to shows that GE told Penn Central what to do with the Pyranol. Operator liability is a poor fit here.

## IV. Contractual Indemnification

CERCLA aside, APU argues that GE is still on the hook for cleanup costs at three railyards (Paoli, South Amboy, and Sunnyside) under sales contracts covering the Arrow II and Silverliner IV railcars. Those contracts have broad indemnity provisions under which GE agreed to indemnify Penn Central against "claims, suits, demands and causes of action of any kind or nature whatsoever . . . caused by [GE] in the manufacture, testing, inspection or repair of any of the cars, or any part thereof, whether occurring prior to or after acceptance of such cars by [the buyer] from the Contractor and whether occurring on or off the premises of the Railroad." (R. 92-3, SEPTA Contract, 3723-24; R. 92-3, NJDOT Contract, 3792.) But whatever those provisions say, APU can't recover under them. Penn Central assigned away its indemnification rights away in the 1970s. And any claims based on reassigned rights are time barred.

### 1. Assignment

In the 1970s, Penn Central declared bankruptcy. Its bankruptcy trustee executed a Bill of Sale in 1976 that transferred substantially all Penn Central assets to Conrail. Those assets included "rights of whatever name or nature . . . in, under and to each and every contract

. . . which is *used or useful in the provision of rail services*." (R. 104-4, Schedule E, 7703 (emphasis added).) And in a similarly worded provision, Penn Central also conveyed "all rights . . . granted by any . . . corporation . . . which Grantor may own, possess or enjoy . . . which are *used or useful in the provision of rail services* assumed by Grantee in connection with the properties conveyed to Grantee by this Bill of Sale and Assignment." (R. 104-4, Schedule H, 7717 (emphasis added).)

While the Bill of Sale conveyed rights, it did not convey liabilities. The Bill of Sale says that "Grantee assumes no liabilities of obligations of any kind which have accrued prior to the date of delivery hereof or which thereafter arise out of any event, act or failure to act which occurred prior thereto in connection with the foregoing contracts or any property." (R. 104-4, Schedule E, 7703.) And it also states that "Grantee assumes no other liabilities or obligations of any kind of Grantor arising out of or in connection with the foregoing rights . . . or any property which is the subject thereof, which have accrued prior to the date of the delivery hereof or which thereafter arise out of the events which have occurred prior thereto." (R. 104-4, Schedule H, 7717.)

APU argues that while the Bill of Sale transferred the right to indemnification for post-conveyance liabilities, it did not convey the right for liabilities that arose before 1976. It relies on the "used or useful" language coupled with the liability retention provisions. The argument goes like this: (1) an indemnity right is a useful right in provision of rail services *but only* if there is a possibility of liability; (2) the Bill of Sale reserved all pre-conveyance liability to Penn Central; (3) the only right useful to Conrail was its right to indemnification for post-conveyance liability; so (4) the Bill of Sale only transferred the indemnification right covering possible post-conveyance liability, meaning Penn Central (now APU) retained the rights for pre-conveyance indemnification. We are unpersuaded.

The Arrow II and Silverliner IV contracts created a broad unitary right to indemnification. The Bill of Sale conveyed to Conrail all rights "used or useful in the provision of rails services" granted by any corporation under every contract. (R. 104-4, Schedule E, 7703; R. 104-4, Schedule H, 7717.) Does the indemnity right fit that description? Yes.

Nothing in the original contract creating the right bifurcated it.  (*See* R. 92-3, SEPTA Contract, 3723-24; R. 92-3, NJDOT Contract, 3792 (agreeing to indemnify for "claims, suits, demands and causes of action of any kind or nature whatsoever . . . caused by [GE] in the manufacture, testing, inspection or repair of any of the cars, or any part thereof, whether occurring prior to or after acceptance of such cars by [the buyer] from the Contractor and whether occurring on or off the premises of the Railroad").)  The Bill of Sale conveyed "rights . . . useful" in providing "rail services," *not* parts of rights or rights *but only to the extent* that they would be useful.  (R. 104-4, Schedule E, 7703; R. 104-4, Schedule H, 7717.)  All rights that fit the description transferred. The liability retention points don't change that.  Those provisions are about retaining liability, not portions of rights.  And because there's no dispute that the "right" at issue—GE indemnification—was a useful right, it was transferred.  That it may have been *more* useful to Penn Central before the transfer than to Conrail after it, does not mean Penn Central retained part of the right.  It still fits the description of the rights conveyed, and the Bill of Sale did not only *partially* transfer any rights.  It just transferred "rights."

## 2.  Reassigned Rights

In 1992, SEPTA, Conrail, and Amtrak filed claims against Penn Central over the Paoli contamination.  The parties settled in 2004. As part of the settlement, SEPTA, Conrail, and Amtrak assigned APU "any and all claims relating to the Paoli Rail Yard Site, if any, against General Electric Company . . . or any component manufacturer of rail cars that may have contributed to contamination at the Paoli Rail Yard Site."  (R. 92-4, Settlement Agreement, 3874.)

APU argues that it can sue GE for indemnification under the 2004 assignment for Paoli-related expenses.[6]  GE claims that APU cannot rely on the assigned rights because APU failed to sue within the limitations period.  GE is right.

---

[6]In its opening brief, APU appears to also make a limitations argument about South Amboy and Sunnyside. But in its brief, GE points out that the 2004 settlement did not transfer claims arising out of the other railyards.  And in its reply, APU does not address the other railyards or dispute this conclusion.  So we only address reassignment as it relates to Paoli.

The parties agree that Pennsylvania law applies. In Pennsylvania, parties must bring claims for contractual indemnifications within four years of accrual. 42 Pa. Stat. and Cons. Stat. Ann. § 5525. But Pennsylvania recognizes "contract[s] of indemnity against liability" and "contract[s] of indemnity against loss."[7] *Coleman v. City of Bradford*, 204 A.2d 260, 261 (Pa. 1964). Accrual depends on the type. "Where the indemnity is against liability, there is a right of recovery as soon as a liability is incurred. Where it is against loss by reason of a liability, there is no right of recovery until a loss occurs." *Id.* (emphases omitted).

The agreement with the original indemnity clause here says that GE "shall indemnify . . . the Railroad harmless from any and all claims, suits, demands and causes of action of any kind or nature whatsoever, and expenses incidental thereto, including, but not limited to counsel fees, for the loss of life or property of or injury or damage to the person or property of any person or corporation whatsoever." (R. 92-3, Article 21, 3723-24.) It also provides that GE "shall further assume all liability for loss by reason of neglect or violation of federal, state, or local laws." (*Id.* at 3724.)

The language here creates a contract of indemnity against liability. While the indemnity provision uses the word "loss," the references to loss are not about loss to the Railroad but to third parties. Omitting the confusing parenthetical break about expenses, the first quoted section says that GE "shall indemnify . . . the Railroad harmless from any and all claims, suits, demands and causes of action of any kind or nature . . . for the loss of life or property of or injury or damage to the person or property of any person or corporation whatsoever." (R. 92-3, Article 21, 3723-24.) So "for the loss" describes the types of liabilities that GE must cover. It does not list another type of covered harm. This reading finds support in what comes after "for the loss." In full, the clause reads: "for the loss of life or property of or injury or damage to the person or property of any person or corporation whatsoever." (*Id.* at 3724.) The losses described are losses to third parties, not loss to the indemnitees. The second quoted section covers "liability

---

[7]There might be a third type. A federal district court, applying Pennsylvania law, recognized a contract that "provide[s] for *both*." *Lincoln Gen. Ins. Co. v. Kingsway Am. Agency, Inc.*, No. 1:11-CV-1127, 2013 WL 458449, at *4 (M.D. Pa. Feb. 6, 2013).

for loss." (*Id.*) So, once again, the loss simply refers to the liability that the agreement covers. APU's argument is therefore unpersuasive.

Because the contract is "a contract of indemnity against liability," "there is a right of recovery as soon as a liability is incurred." *Coleman*, 204 A.2d 260, 261 (Pa. 1964). "[T]he indemnitee may recover as soon as his liability has become fixed and established." *Id.* A cause of action for indemnification thus accrues at that point. *Nwoga v. Cmty. Council For Mental Health & Retardation, Inc.*, No. CIV.A. 12-5393, 2013 WL 705917, at *8 (E.D. Pa. Feb. 27, 2013) ("For statute of limitation purposes, a claim of indemnity originates when 'liability is fixed by a judgment against . . . the indemnitee.'").

APU only has the indemnity rights at issue because SEPTA and Conrail[8] assigned those rights in 2004. Assignors can only assign rights they possess, which means assignees like APU "stand[] in the shoes of the assignor." *Crawford Cent. Sch. Dist. v. Com.*, 888 A.2d 616, 620 (Pa. 2005). So the analysis turns on when SEPTA and Conrail's right to indemnification became "fixed and established." *See Coleman*, 204 A.2d at 261. The answer is 1999. So APU's 2005 action was untimely under Pennsylvania's four-year limitations period.

The United States, Pennsylvania, Amtrak, SETPA, and Conrail entered a series of consent decrees in the 1990s resolving Paoli environmental liability. The United States District court for the Eastern District of Pennsylvania entered the last decree in 1999. At that point SEPTA and Conrail's liability became fixed, triggering the limitations clock for asserting the contractual right to indemnification.

APU resists this conclusion, pointing to Paoli-related litigation after 1999 up through the 2004 settlement. But this post-1999 litigation was not about SETPA and Conrail's liability under the 1999 consent decree. Their liability to the United States and Pennsylvania was fixed. (*See* R. 96-2, 1999 Consent Decree, 5145 ("The objectives of the Parties in entering into this

---

[8]While Amtrak also assigned any Paoli-related claims to APU, APU's argument (and the district court's decision) only deals with contractual rights assigned by SEPTA and Conrail. This makes sense because "Amtrak was never a party to or a third-party beneficiary of the indemnity provisions in the SEPTA or NJDOT contracts, so it had no contractual indemnity rights to assign to APU." (R. 158, GE Mot. for Reconsideration, 25494; *see also* R. 161, APU Response, 25918 (explaining that APU is asserting indemnity rights based on the SEPTA and Conrail assignments without mentioning Amtrak).)

Consent Decree are . . . to resolve all Plaintiffs' claims against Settling Defendants as provided in this Consent Decree."); *id.* ("The obligations of Settling Defendants to finance and perform the Work and to pay amounts owed the United States and the Commonwealth under this Consent Decree are joint and several.").) The only question was whether SEPTA and Conrail could then get APU's help in covering the financial liability they had incurred and satisfied. (*See* Appellant Br. at 84 ("This agreement . . . brought finality to the dispute over . . . allocation of responsibility . . . .").) APU's argument fails; this train left the station before APU sued in 2005.

## V. Conclusion

We **AFFIRM**. GE does not qualify as an operator or arranger. APU assigned its pre-conveyance right to indemnification. And any claims based on indemnity rights reassigned to APU in 2004 are untimely.